SAM HARDING LAW FIRM
SAM HARDING, ESQ.
Nevada Bar No. 1877
1100 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone:  (702) 333-7777
Facsimile:  (702) 384-5731
Attorney for Claimants

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

In re SEVEN RESORTS, INC. a Nevada          )
corporation, d/b/a SEVEN CROWN              )          2:10-cv-01149-PMP-LRL
RESORTS, as owner of a certain 1986         )
houseboat manufactured by Master            )          In Admiralty
Fabricators; Summit Model; Echo Bay rental  )
No. 224, for exoneration from or limitation )
of liability,                               )
                  Plaintiff.                )
_____ )

MOTION TO DISMISS OF CLAIMANTS

   Mary Jolynn Murphy and Michael Browning, individually and as the natural parents of

Joshua Murphy, deceased, and Mary Jolynn Murphy as Special Administrator of the Estate of

Joshua Murphy, deceased, (hereinafter "Claimants") by and through their undersigned

attorneys, move this Court pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), to

dismiss the Amended Complaint for Exoneration from or Limitation of Liability of Seven

Resorts, Inc. d/b/a Seven Crown Resorts (hereinafter "Seven Crown" or Plaintiff in Limitation)

alleging special admiralty jurisdiction and claim pursuant to the Shipowner's Limitation of

Liability Act of 1851, 46 U.S.C. §§ 30501-12 (sometimes referred to as "LOLA" or the Act)

and Supplemental Rule F for Certain Admiralty or Maritime Claims.

This motion is based upon the following Memorandum of Points and Authorities in support of Motion to Dismiss of Claimants, the Declaration of Counsel, its supporting Exhibits, and any further argument entertained by this Court at the hearing of this Motion.

DATED this 17th day of November, 2010.

SAM HARDING LAW FIRM

By: /s/ Sam Harding
Sam Harding, Esq.
Nevada Bar No. 1877
1100 East Bridger Ave.
Las Vegas, Nevada  89101
Telephone:  (702) 333-7777
Facsimile:   (702) 384-5731
suecash@live.com

Dennis M. Prince, Esq.
Nevada Bar No. 5092
PRINCE & KEATING
3230 S. Buffalo Dr., Ste. 108
Las Vegas, Nevada  89117
Telephone:  (702) 228-6800
Facsimile:   (702) 228-0443
DPrince@PrinceKeating.com
Attorneys for Claimants

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF MOTION TO DISMISS OF CLAIMANTS**

**I.**
**PRELIMINARY STATEMENT**

The Plaintiff in Limitation, Seven Crown, has brought this special admiralty claim in an attempt thwart a state tort action arising from the death of Joshua Murphy, the son of Mary Jolynn Murphy and Michael Browning.  Seven Crown is attempting to manipulate an 1851 statute designed to encourage commercial ship building, and limit its damages recoverable by the Claimants to the alleged value of a houseboat, between $30,000 and $40,000.  Claimants seek dismissal upon the grounds that this Court lacks subject matter admiralty jurisdiction because Seven Crown did not file its Complaint within the six month period after notice as provided by 46 U.S.C. §§ 30511(a).  Claimants also seek dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), for lack of subject matter admiralty jurisdiction, both facially and factually, because Seven Crown cannot establish the connection test for admiralty jurisdiction, and because Seven Crown cannot establish the absence of  "privity or knowledge," necessary for relief under the Limitation of Liability Act, 46 U.S.C. § 30505(b).

**1.  Statement of Facts**

The facts before this Court stem from the tragic death of an eleven year old boy, Joshua Murphy, who died from carbon monoxide asphyxiation with drowning as a secondary cause. The incident occurred at a cove on the western side of Lake Mead, north of Echo Bay and south of Pump House Cove.  On August 20, 2009, Michael Browning, the father of Joshua Murphy, had returned from Echo Bay Marina between 4:00 and 5:00 p.m. to their houseboat that they rented from Seven Crown, identified as Echo Bay rental houseboat No. 224.  It was believed that the generator of the houseboat was turned on at that time.  Shortly before 8:30 p.m., Michael Browning was grilling on the bow of the vessel and his son, Joshua Murphy, was near

the starboard stern playing on a raft that was tied to the houseboat at or just forward of the starboard stern gate.  (See Exhibit 3 National Park Service, Incident Report, LAME 09-2562). Michael Browning told Joshua Murphy to get out of the water, that it was about dinner time and Joshua Murphy replied, "Okay, Daddy."  A few minutes later, other parties on the houseboat began inquiring where Joshua Murphy was, and they looked inside the houseboat and did not find him.  They looked on both sides of the houseboat, calling for Joshua Murphy, and at that time, looked over the edge of the railing where Joshua Murphy had been playing on the starboard side and saw him floating face down in the water between the houseboat and the raft.

Joshua Murphy was immediately pulled from the water and the adults began CPR.  At approximately 8:40 p.m. on August 20, 2009, Gregory Johnson, an Officer of the National Park Service, was contacted at his residence to respond to a reported drowning of an eleven year old boy.  At approximately 9:30 p.m., Ranger Martin and Ranger Johnson, along with a medical team from Rescue 74, arrived at the scene where the houseboat was tied to the shore, and observed family members performing CPR on Joshua Murphy.  From there, Joshua Murphy was airlifted from the scene by Metro SAR Air 6 to the Echo Bay launch ramp, where he was transferred to Mercy Air 11 and transported to UMC Trauma Center.  The officers determined that Joshua Murphy was floating on a raft tied to the houseboat near the aft starboard area, and that the generator for the houseboat was running at the time, and was located at the aft starboard corner of the vessel.  The National Park Service report indicates that they received information from the Clark County Coroner's Office that Joshua Murphy died of carbon monoxide poisoning as the primary cause and drowning as the secondary cause.  (See Exhibits 2 and 3). An autopsy report from the Clark County Coroner's Office was issued on August 21, 2009, and the National Park Service report was issued on August 29, 2009.

Prior to the issuance of the National Park Service report, counsel for Claimants sent his notice letters to Kenneth Harris, the Insurance Adjuster for Seven Crown Resorts.  These two letters were sent via email on August 27, 2009.  (See Exhibit 1).

On August 31, 2009, counsel for Claimants arranged a visit of their expert witness to view and analyze houseboat No. 224 for the purposes of establishing the source of the carbon monoxide and why the generator and its exhaust system permitted the accumulation of carbon monoxide gas at or near the aft portion of houseboat No. 224.  Claimants' expert formalized his report contained in Exhibit 4.  The report of Claimants' expert indicates that NIOSH studies were done in 2001, at Lake Mead and Echo Bay Marina, and the report was addressed to Mr. Bob Clark, Vice President, Seven Crown Resorts, Boulder City, Nevada.  The April, 2001 report tested the generator on Summit Houseboat which exhausted  over the starboard side of the houseboat.  This is the same location as the exhaust in the houseboat No. 224.   The Summit Houseboat had readings higher than the NIOSH recommendation of 1200 ppm.

The generator on houseboat No. 224 is not the original generator but a replacement installed sometime after February, 2008.  Claimants' expert report indicates that carbon monoxide gas from the generator could have been removed by an exhaust stack terminating above the highest occupied deck on the houseboat as suggested by NIOSH studies.  Claimants' expert concluded that by 2001, the carbon monoxide problem on this houseboat and others was well known to Plaintiff in Limitation and when Seven Crown decided to replace the generator, it was a simple and inexpensive repair to design the carbon monoxide problem out of the houseboat.  From this, Claimants' expert opined that Seven Crown knew, or should have known, that a vertical stack arrangement on the houseboat was a viable, low cost, safer approach to generator exhaust, and the potential of carbon monoxide poisoning.  From this,

Claimants' expert concluded that the actions and/or inactions of Seven Crown were the cause of the death of Joshua Murphy. (See Exhibit 4).

On March 10, 2010, Claimants obtained the Letters of Administration for the Estate of Joshua Murphy, deceased. (Exhibit 5).  On March 18, 2010, Claimants filed their Complaint in Clark County, Nevada. (Exhibit 6).

### 2. Procedural History

On or about August 27, 2009, counsel for Claimants provided written notice to Seven Crown of their claim for the death of Joshua Murphy.  (Exhibit 1).  On July 13, 2010, Seven Crown filed its Limitation Complaint (Doc. No. 1) before this Court.  On August 20, 2010, Seven Crown filed its Amended Complaint. (Doc. No. 8).  On October 13 and 15, 2010, this Court issued its Orders regarding Notice of Claim for Exoneration and Restraining the Nevada state court suit.  (Doc. No. 16 and 17).  On November 12, 2010, Claimants filed their Answer to the Amended Complaint of Seven Crown and the Claims of Mary Jolynn Murphy, Michael Browning and Mary Jolynn Murphy as Special Administrator of the Estate of Joshua Murphy, deceased. (Docs. No. 18 and 19).

### II.
### ARGUMENT

The Claimants are attacking Seven Crown's Limitation of Liability Act amended complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and pursuant to Fed. R. Civ. P. 12(b)(6). Claimants assert that this Court does not have admiralty jurisdiction over this matter, and that the LOLA does not apply to the underlying incident in which Joshua Murphy died of carbon monoxide asphyxiation.

…

### 1.  Standard under Fed. R. Civ. P. 12(b)(1).

Claimants' attack pursuant to Fed. R. Civ. P. 12(b)(1) has two prongs:  First, Seven Crown did not file its limitation proceeding within six months after it first received written notice of the claims from Claimants' attorney.  An action filed by a shipowner seeking to limit its liability must be brought within six months after a claimant gives the owner written notice of a claim.  46 U.S.C. §§ 30511; *See also* Supplemental Rules for Certain Admiralty and Maritime Claims, Rule F.  The six month proscriptive period requires a shipowner to act promptly to gain the benefit of the right to limit liability and prevents the shipowner from waiting to file until the later stages of any claim.  *See Exxon Shipping Company v. Cailleteau*, 869 F2d. 843, 846 (5th Cir. 1989).

The Claimants' also seek dismissal pursuant to Fed. R. Civ. P. 12(b)(1), both facially and factually, because the Court does not have subject matter jurisdiction of the amended complaint because Seven Crown cannot establish the "connection" tests of admiralty jurisdiction.  The tort in this case must occur at the time of the incident on navigable waters (location) and the wrong must bear a sufficient connection with maritime activity (connection).  *Grubart, Inc. v. Great Lakes Dredge & Dock Company,* 513 U.S. 527, 534 (1995); *Seven Resorts, Inc. v. Cantlen*, 57 F.3d 771, 773 (9th Cir. 1995).

In deciding a Rule 12(b)(1) motion to dismiss, based upon a "facial attack," this Court considers the allegations of the complaint as true.  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).  However, this Court is permitted to look beyond the amended complaint at the documents provided by the Claimants, to decide the Rule 12(b)(1) issues of subject matter jurisdiction.  *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir. 2000).  Once the Claimants have converted the motion to dismiss into a factual motion by presenting evidence properly brought before this Court, the party opposing the motion must furnish affidavits or

other evidence necessary to satisfy its burden of establishing subject matter jurisdiction. *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). Where jurisdiction is intertwined with the merit, this Court is not compelled to assume as true the allegations in the limitation complaint when the facts are controverted by evidence from the Claimants. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

In this case, the facts necessary to sustain jurisdiction and withstand the Rule 12(b)(1) motion, do not implicate the merits of Limitation Plaintiff's First Amended Complaint and therefore this Court may proceed under Rule 12(b)(1) to weight the evidence and satisfy itself as to the existence of its power to hear this case. *Williamson v. Tucker*, 645 F.2d 404, 412-13 (5th Cir. 1981). The existence of disputed material facts on a timeliness challenge under Rule 12(b)(1) do not preclude this Court from evaluating for itself the merits of the jurisdictional claims. *Williamson*, 645 F.2d at 413. The Claimants will argue more fully hereinbelow that Seven Crown was fully aware of the claims in this case for the wrongful death of Joshua Murphy, but waited over 6 months after first receiving notice of the claims

### 2. Standard under Fed. R. Civ. P. 12(b)(6).

It is often stated that in considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the allegations of the complaint must be construed in a light most favorable to the non-moving party. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). However, to avoid a Fed. R. Civ. P. 12(b)(6) dismissal, "the pleading must contain something more…than…a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atlantic Corp. v. Twombly*, 555 U.S. 544, 555-56. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 555 U.S. at 555). Although a court's review on a 12(b)(6) motion to dismiss is generally "limited to the contents

of a complaint, " this Court may also consider documents without converting the motion into a motion for summary judgment.  *See Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987).

In *Iqbal*, the Supreme Court recently clarified the two-step approach district courts are to apply when considering motions to dismiss.  First, the court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth.  *Iqbal*, 129 S.Ct. at 1950.  Mere recitals of the elements of a cause of action or the statutory provisions, supported only by conclusory statements, do not suffice.  Second, this Court must consider whether the factual allegations in the complaint allege enough facts to satisfy all of the elements of a claim.  Where the complaint does not permit the court to infer more than the mere possibility, the complaint has alleged – but not shown- that the pleader is entitled to relief.  *Iqbal*, Id. at 1949.  When the claim in a complaint has not crossed the line from conceivable to plausible, the claim must be dismissed.  *Twombly*, 550 U.S. at 570.  In this case, as more fully argued hereinbelow, Seven Crown has only tracked the language of 46 U.S.C. §§ 30501 et seq. and has asserted conclusions to fit the statutory language.  These Fed. R. Civ. P. 12(b)(6) defects require this Court to dismiss the Amended Complaint of Seven Crown.

**3.  Seven Crown's Amended Complaint in Limitation Was Untimely and Therefore this Court is Without Subject Matter Jurisdiction.**

The Ninth Circuit Court of Appeals has had an opportunity to examine the current status of the Limitation of Liability Act of 1851, Act of March 3, 1851, 9 Stat. 635 and its various amendments.  *In re Esta Later Charters, Inc.*, 875 F.2d 234 (9th Cir. 1989) the court noted  that shortly after the close of the middle ages, many European seafaring nations developed a rule of maritime law that limited a shipowner's liability to the value of the vessel and its cargo.  *In re*

*Esta Later Charters Inc.,* 875 F.2d at 234.   The court examined the history of the Act and its notice amendment.   In 1936, the Act added a six-month limitation period for filing a petition running from written notice of a claim.   This six-month's notice is contained in 46 U.S.C. § 3511 and Rule F of the Supplementary Rules for Admiralty and Maritime Claims.   The court stated that there was no good reason, in a close case, to construe the Act in favor of shipowners. The prior rational for doing so appeared to have been that this would have helped promote healthy merchant marine.   However, recent events have cast doubt on the continued vitality of the object of the Act, and the court found it especially inappropriate because many of the conditions in the shipping industry that induced the 1851 Congress to pass the Act no longer prevail.   In the present era, the use of corporations as the standard form of business, with numerous forms of insurance protection, courts no longer need to indulge the antiquated requirements of the Limitation of Liability Act.

With this in mind, most courts that have examined what would constitute sufficient written notice, support a finding that the letters from Claimants' attorney to the insurance adjuster for Seven Crown on August 27, 2009, provided the necessary notice and the Complaint in Limitation filed by Seven Crown on July 13, 2010, was therefore untimely.

For example, *In re Beesley's Point Sea-Doo, Inc.*, 956 F.Supp. 538 (D.N.J. 1997) the court examined letters sent by the former attorney of a claimant that was relied upon to demonstrate that a vessel owner had untimely sought exoneration or limitation of liability.   The former attorney had  written the owner stating that he represented one of the claimants in regard to the injuries the claimant sustained, and advised the shipowner to turn the letter over to its insurance company or attorney immediately.   The vessel owner, argued that the letter was insufficient to serve as notice of a claim because it merely advised an incorrect entity  of one claimant's representation.   The court found that in such a situation it must look to "whole tenor"

10

of the letter when determining whether it constitutes notice.  The court stated that a "letter from an attorney that informs a vessel owner of the attorney's representation of a person who was injured while operating that owner's vessel and advises the owner to contact its insurance company is sufficient to put the owner on notice of a potential claim." *Beesley's Point Sea-Doo, Inc.*, 956 F.Supp. at 540.

The court relied upon the decision in *Complaint of Bayview Charter Boats, Inc.*, 692 F.Supp. 1480, 1485-86 (E.D.N.Y. 1988) where it was found that a letter by attorneys informing a ferry owner of representation of a swimmer in connection with his personal injuries and requesting the owner to refer the letter to insurance and/or legal representation was sufficient "notice of claim" even though the letter did not contain a threat of legal proceedings.  The court also examined other sources of notice from telephone contacts between the attorney and the various entities, the existence of a boating accident report, and investigation of the incident.  In the case before this Court, counsel for the Murphy Claimants immediately contacted the operators at Seven Crown Resorts, and arranged for an examination of the houseboat and placed Seven Crown on notice that no destructive testing should occur prior to examination of the vessel by Plaintiff's expert.

It is simply unacceptable that Seven Crown attorneys and insurance carrier would wait until an action was commenced in the state court and then, again, wait additional months before, as an after thought, file the herein Complaint in Limitation on July 13, 2010.  Seven Crown failed to file for limitation of liability in a timely fashion.

The *Beesley's Point Sea-Doo* case relied upon the decision in *Doxsee Sea Clam Co. v. Brown*, 13 F.3d 550 (2nd Cir. 1994) and *In re Complaint of McCarthy Brothers Co.,* 83 F.3d 821 (7th Cir. 1996).  Both of these cases hold that a letter sent is sufficient to trigger the six-month period if (1) it informs the shipowner of an actual potential claim; (2) which may exceed

the value of the vessel (3) and is subject to limitation.  The written notice of claim only need reveal a "reasonable possibility" that the claim made is one subject to limitation.  *Doxsee Sea Clam Co.*, 13 F.3d at 554; *Complaint of McCarthy Brothers Co.*, 83 F.3d at 827.

Courts have also found it only necessary for a written notice to provide discussion of the occurrence, an intention to seek damages and letters are to be read using a "broad and flexible standard." *In re Wepfer Marine,* 344 F.Supp.2d 1120, 1128 (W.D. Tenn. 2004).

When the insurance adjuster for Seven Crown undertook its investigation in August, 2009, subject to the limitations and spoliation fears of counsel for Claimants, it was patently clear that the wrongful death of Joshua Murphy would be resolved by claims against Seven Crown, by virtue of the circumstances of Joshua Murphy's asphyxiation in proximity to houseboat No. 224.  There simply is no question that the insurance company, its adjuster, and everyone at Seven Crown, understood that a policy-limit claim would be made by the family of Joshua Murphy for his tragic death.

On this basis alone, this Court should find that pursuant to Fed. R. Civ. P. 12(b)(1). it does not have subject matter admiralty jurisdiction over this case for the failure on the part of Seven Crown to timely file its Complaint in Limitation.

**4.  Seven Crown has the Burden of Establishing Subject Matter Jurisdiction of Its Complaint for Relief Under the Limitation of Liability Act.**

Both Fed. R. Civ. P. 12(b)(1) and 12(b)(6) require Seven Crown to establish that this Court has admiralty jurisdiction.  Seven Crown must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.  *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003).  For this Court to have jurisdiction under the Act, Seven Crown has to establish both the "location" and "connection" test of admiralty jurisdiction.  The torts must occur on navigable waters (location) and the

wrong must bear a sufficient connection with maritime activity (connection).  *Grubart, Inc. v. Great Lakes Dredge and Dock Co.*, 513 U.S. 527, 534 (1995); *Seven Resorts, Inc. v. Cantlen*, 57 F.3d 771, 773 (9th Cir. 1995).  Before 1972 there was little question that the incident in this case would have fallen within admiralty jurisdiction because it extended to all torts involving vessels on navigable waters.  *See Sisson v. Ruby*, 497 U.S. 358, 361 (1990).  Ten years later, the U.S. Supreme Court stated unequivocally that an accident involving two pleasure boats colliding on a navigable river would include traditional maritime activity beyond commercial maritime activity.  *Formost Insurance Co., v. Richardson*, 457 U.S. 666, 668 (1982).  The Court found in *Formost* that admiralty jurisdiction existed because the pleasure boat collision had a "potentially disruptive impact" on maritime commerce.  The court noted that "not every accident in navigable waters" that might disrupt maritime activity will support federal admiralty jurisdiction.  *Formost*, 457 at 675 n. 5.

In *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249 (1972) the sinking of a plane in navigable waters did not give rise to a claim in admiralty even though an aircraft sinking in the water could create a hazard for the navigation of commercial vessels in the vicinity.  In *Sisson v. Ruby*, 497 U.S. 358 (1990), and *Jerome B. Grubart, Inc. v. The Great Lakes Dredge & Dock Company*, 513 U.S. 527 (1995), the Supreme Court established and honed a two-pronged test to determine if admiralty jurisdiction extends to tort claims occurring on navigable waters.  Today, in order to invoke federal admiralty jurisdiction over a tort claim, Seven Crown must satisfy both the location and connection tests with respect to maritime activity.  At this juncture, Claimants will not challenge the satisfaction of the location test.  But we will fully examine the connection test.

…

**5.  Seven Crown has not Pled and Cannot Show a Substantial Connection of the Incident to Maritime Activity.**

The connection test has two prongs.  First, this Court must assess the "general features of the type of incident involved" in order to determine whether the incident has a potentially disruptive impact on maritime commerce.  *Grubart*, 513 U.S. at 534 (quoting *Sisson*, 497 U.S. at 363, 364 n. 2).   In determining whether this requirement has been met, the Court must consider the incident giving rise to the claim at an 'intermediate level of generality."  *Grubart*, 513 U.S. at 538.  Second, the Court must determine whether the "character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."  *Grubart*, 513 U.S. at 534.

**a.  The General Nature of the Incident Does not Have a Potentiality of Disruptive Impact on Maritime Commerce.**

In *Sisson*, the Supreme Court held that there was admiralty jurisdiction over a case in which a fire broke out in a washer-dryer area of a pleasure yacht.  The yacht was docked at a recreational marina on Lake Michigan.  *Sisson*, 497 U.S. at 360.  The fire spread and damaged several neighboring boats in the marina.  No commercial vessels were damaged because none were docked at the marina and no commercial vessels were ever likely to be docked at such a recreational marina.  A characterization of the general features of the incident resulted in the following:  "a fire on a vessel docked at a marina on navigable waters."  *Sisson*, 497 U.S. at 363.  The court concluded that certainly such a fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels.

In *Grubart*, the Supreme Court refined this position and stated that the potential effects inquiry turns on a "description of the incident at an intermediate level of possible generality."  *Grubart*, 513 U.S. at 538.  The court held that to characterize the incident in *Sisson* as a "fire"

would have been too general to differentiate cases.  At the other extreme, to have described the fire as damaging nothing but pleasure boats and their tie up facilities would have ignored, the capacity of pleasure boats to endanger commercial shipping that happened to be nearby.  The court in *Grubart* held that the focus of the potential effects inquiry is not on the specific facts at hand, but on whether the general features of the incident were likely to disrupt commercial activity.

The Ninth Circuit has had an opportunity to consider facts parallel to those before this Court under the above standard.  In *H20 Houseboat Vacations v. Hernandez*, 103 F.3d 914 (9th Cir. 1996) the court held that admiralty jurisdiction was lacking in a case in which family members were injured by carbon monoxide while they slept aboard a houseboat that was tied to the shore of Lake Havasu.  The court held that, unlike a fire on a boat, carbon monoxide fumes would not be dangerous if they escaped and concluded that the facts were far different from those in *Sisson* in which the fire had the potential to spread to other vessels and the marina.  The court acknowledged that it was possible to speculate that the houseboat would have posed a hazard to maritime commerce if it had slipped its tie to shore and drifted onto the lake, or if the passenger had been overcome with carbon monoxide fume and lost consciousness while navigating, but such speculation would require it to ignore the actual incident that caused the injury.  *H20 Houseboat Vacations*, 103 F.3d at 916-17.  The Ninth Circuit characterized the general features of the incident as follows:  "The emissions of carbon monoxide fumes encapsuled within the houseboat tied to shore."  *Id.* at 917.

In this case, the description of the incident at the intermediate level of generality is: emission of carbon monoxide fumes near the rear of a vessel anchored to the shore of a navigable lake.  The general features of the case before this Court are parallel to those in *H20 Houseboats.*  With the electrical generator of Seven Crown pumping carbon monoxide gas out

15

and around the edge of the houseboat in close proximity to swimmers, the general features of this case do not have the potential to disrupt maritime activity.  The boat was not being used in any traditional commercial activity and therefore there was no connection from generality with any historic admiralty interest.  It is too speculative to assert that any rescue attempt to the houseboat had the potential to impede commercial maritime traffic. Just because the houseboat was rented as a commercial enterprise, does not translate into a traditional maritime activity that would disrupt or impede traffic on Lake Havasu.  Seven Crown has failed to plead any facts, much less sufficient facts, to establish the necessary connection of the incident.  Seven Crown has only pled legal conclusions and therefore has failed to establish the necessary connection of the incident with maritime activity and thus the Amended Complaint is defective and Seven Crown has not established admiralty jurisdiction.

   **b.  The Activity Giving Rise to the Incident Does Not Have a Substantial Relationship to Traditional Maritime Activity.**

   The second part of the connection test is that Seven Crown must show a substantial relationship between the general character of the activity giving rise to the incident and traditional maritime activity.  *Sisson*, 497 U.S. at 367.  It has been recognized that a tortfeasor's activity on navigable waters must be "so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in this suit. *Grubart*, 513 U.S. at 539-40.  In this case, the characterization of the general nature of the Seven Crown's activity, providing a generator and a defective exhaust system that injures a swimmer, has no relationship to traditional maritime activity.  In *Grubart, Inc.* the court held that injury to a swimmer from diving into shallow but navigable waters did not meet the test. *Grubart*, 513 U.S. at 543.     Further, in *Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260 (9th Cir. 1993), the owner of a houseboat filed a petition under the Act to limit his liability

for injuries suffered by a youth who dove from the boat into shallow water.  Rejecting the owner's characterization of the activity, as not reasonable and not making common sense, the court affirmed dismissal of the petition for the lack of subject matter jurisdiction.  The court concluded that *Delta* has not shown a substantial relationship between aquatic recreation off a pleasure boat and traditional maritime activity.  *Delta Country Ventures, Inc.*, 986 F.2d at 1263.  Likewise, in *Crosson v. Vance*, 484 F.2d 840 (4th Cir. 1973), it was held that admiralty jurisdiction did not reach a claim for personal injuries by a water skier against the operator of a towboat that towed the skier into too shallow water, because the activity had insufficient connection to traditional maritime activity.

The speculation raised by Seven Crown in its Amended Complaint, does not satisfy the second prong.  The second prong of the connection test is not easily met in this case because the negligent activity of Seven Crown occurred when it did not remedy the generator/carbon monoxide problem on houseboat No. 224.  That neglect does not substantially relate to traditional maritime activity, even when given the broad perspective demanded by the second prong of the connection test. Since Seven Crown cannot establish the second connection prong, the Court does not have admiralty jurisdiction.

**6.  The Complaint in Limitation Must be Dismissed Because the Allegations of the Claimants Demonstrate Privity or Knowledge of Seven Crown.**

The Act affords relief from liability arising only from any act done, without the privity or knowledge of the owner.  46 U.S.C. §§ 30305(b).  Privity means some knowledge or personal participation of the owner in the fault or negligence which caused or contributed to the injury. *Joyce v. Joyce*, 975 F.2d 379, 384 (7th Cir. 1992).  Knowledge includes not only actual but constructive knowledge, i.e. the Act was not intended to shield ship owners from liability for the choice of incompetent personnel, at least when the owner participates fully in the choice.

17

A complaint under the LOLA must be dismissed for lack of subject matter jurisdiction when the causes of action pled in the state court action from which relief is sought, require conduct by the owner with "privity or knowledge" under the Act.  All that is needed to deny limitation is that the ship owner, by prior action or inaction, sets into motion a chain of circumstances that may be a contributing cause, even though not the immediate or proximate cause of the casualty.  *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1303 (7th Cir. 1992) (Quoting *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1158 (2nd Cir. 1978).  Seven Crown bears the burden of proving that it lacked privity or knowledge.  *See the Amoco Cadiz*, 954 F.2d at 1303.

In a typical situation, this Court should follow a two step procedure for determining whether the vessel owner, i.e. Seven Crown, is entitled to limit its liability because of no privity or knowledge.  The Court determines what acts of negligence or conditions caused the accident. It is undisputed that the cause of Joshua Murphy's death was carbon monoxide poisoning, the source of which was the venting of the exhaust of the generator in too close proximity to swimmers in the water around the houseboat.  Second, the Court determines whether Seven Crown had knowledge or privity of those same acts of negligence or conditions.  *Hercules Carriers, Inc. v. Claimant State of Florida, Department of Transportation*, 768 F.2d 1558, 1563-64 (11th Cir. 1985).  There has been no evidence brought forth by Seven Crown that anyone other than it and its employees and agents performed work on houseboat No. 224, and made the decision not to put in a proper exhaust system when they had specific knowledge that it presented a danger as configured.  In *Joyce*, *supra*, the Court of Appeals for the Seventh Circuit held that "privity and knowledge" are deemed to exist where the owner has the means of knowledge or, where knowledge would have been obtained from "reasonable inspection" and the negligent failure to discover constitutes privity and knowledge within the meaning of the (Act).  *Joyce*, 975 F.2d at 384.  Moreover, courts have also noted that the recent trend has been

to enlarge the scope of activities within the privity or knowledge of a ship owner, including requiring ship owners to exercise an increasing degree of supervision and inspection.  The *Amoco Cadiz*, 954 F.2d at 1303.  In this case, the technical report of Claimants' experts found multiple acts of negligence, some amounting to gross negligence, for the failure of Seven Crown to reconfigure the generator and exhaust when it had an opportunity to do so.  On this basis alone, privity and knowledge has been shown, and Seven Crown has not overcome it sufficiently for protection under the Act.  Reasonable diligence, over a long period of time, would have uncovered the dangers presented by the generator and its exhaust system to swimmers off the back of houseboat No. 224.  Reasonable diligence would have included inspecting and testing the generator system while it was running, in a situation similar to those during use by the Murphy family.  Because Seven Crown has not met its burden for showing that it lacked privity or knowledge, this Court cannot limit its liability under the Act.  A review of the complaint of the Claimants in Nevada state court, conclusively demonstrates conduct, if proven, that would necessarily be within Seven Crown's privity or knowledge.

### III.
### CONCLUSION

Seven Crown has not properly pled and cannot establish admiralty jurisdiction.  Seven Crown has not pled any facts to establish the connection of the incident with traditional maritime activity.  The general features of the incident do not have a potentially disruptive effect on commerce, and the general nature of the activity giving rise to the incident, i.e. the configuration of the generator and its exhaust, does not have a substantial relationship with traditional maritime activity.  This Court cannot grant any relief to Seven Crown because the state court action from which relief is sought pleads causes of action requiring conduct by Seven Crown amounting to privity or knowledge under the Limitation of Liability Act.

Finally, the Limitation of Liability Act, interpreted according to its purposes, does not reach the circumstances of this case.  For all of these reasons, this Court should dismiss the herein action of Seven Crown.

DATED this 17th day of November, 2010.

<div style="margin-left: 40%;">

SAM HARDING LAW FIRM

By: /s/ Sam Harding
Sam Harding, Esq.
Nevada Bar No. 1877
1100 East Bridger Ave.
Las Vegas, Nevada  89101
Telephone:  (702) 333-7777
Facsimile:  (702) 384-5731
suecash@live.com

Dennis M. Prince, Esq.
Nevada Bar No. 5092
PRINCE & KEATING
3230 S. Buffalo Dr., Ste. 108
Las Vegas, Nevada  89117
Telephone:  (702) 228-6800
Facsimile:  (702) 228-0443
DPrince@PrinceKeating.com
Attorneys for Claimants

</div>

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was forwarded by electronic means through the Court's ECF System to all counsel of record, as follows:

Chad R. Fears, Esq.
Snell & Wilmer, LLP
3883 Howard Hughes Pkwy
Las Vegas, NV  86169
cfears@swlaw.com

Craig Logsdon, Esq.
Snell & Wilmer, LLP
400 E. Van Buren St.
Phoenix, AZ  85004
clogsdon@swlaw.com

Patrick X. Fowler, Esq.
Snell & Wilmer, LLP
400 E. Van Buren St.
Phoenix, AZ   85004
pfowler@swlaw.com

Alex B. Marconi, Esq.
400 E. Van Buren St.
Phoenix, AZ   85004
amarconi@swlaw.com
(*Pro Hac Vice*)
Attorneys for Limitation Plaintiff

Dennis M. Prince, Esq.
Prince & Keating
3230 S. Buffalo Dr., Ste. 108
Las Vegas, Nevada  89117
DPrince@PrinceKeating.com
Attorney for Claimants

By:  /s/  Sam Harding
      Sam Harding, Esq.

SAM HARDING LAW FIRM
SAM HARDING, ESQ.
Nevada Bar No. 1877
1100 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone:  (702) 333-7777
Facsimile:  (702) 384-5731
Attorney for Claimants

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re SEVEN RESORTS, INC. a Nevada corporation, d/b/a SEVEN CROWN RESORTS, as owner of a certain 1986 houseboat manufactured by Master Fabricators; Summit Model; Echo Bay rental No. 224, for exoneration from or limitation of liability, | ) ) ) ) ) ) ) ) | 2:10-cv-01149-PMP-LRL<br><br>In Admiralty<br><br>**DECLARATION OF COUNSEL IN SUPPORT OF MOTION TO DISMISS** |
| Plaintiff. | ) ) | |

I, Samuel A. Harding, declare:

1.   That I am counsel and attorney of record for Claimants/Real Parties in Interest, Mary Jolynn Murphy, individually, and as Special Administrator of the Estate of Joshua Murphy, deceased, and Michael Browning.

2.  I have personal knowledge of the facts stated below and if called to testify I would so state.

3.  Exhibit 1 consists of true and correct copies of two letters dated August 27, 2009 directed to Mr. Ken Harris, Adjustor for Seven Crown Resorts, from Samuel A. Harding, Esq., giving notice to Seven Crown of the claims for the death of Joshua Murphy and other matters relating to the extent of the claim and insurance coverage for the incident.

4.  Exhibit 2 is a true and correct copy of the Coroner Autopsy Report, Clark County, Nevada, Case No. 09-06671 pertaining to the examination of the body of Joshua Murphy, deceased.

1

5.  Exhibit 3 is a true and correct copy of the Incident Report, Incident No. LAME 09-2562, U.S Department of the Interior, National Park Service, dated August 31, 2009.

6.  Exhibit 4 is a true and correct copy of the Engineer's Report, Arthur W. Faherty, pertaining to his inspection of August 31, 2009, of that certain 1986 houseboat manufactured by Master Fabricators, Summit Model, Echo Bay rental No. 224, as memorialized under Report File No. 09FE0363, dated February 26, 2010.

7.  Exhibit 5 is a true and correct copy of the Letters of Special Administration appointing Mary Jolynn Murphy, dated March 10, 2010, attached herewith for the Court's convenience.

8.  Exhibit 6 is a true and correct copy of the Complaint, Case No. A-10-612210-c, dated April 18, 2010 against Seven Resorts, Inc. d/b/a Seven Crown Resorts, submitted for this Court's convenience.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of November, 2010 at Las Vegas, Nevada.

SAM HARDING LAW FIRM

By: _/s/ Sam Harding_
Sam Harding, Esq.
Nevada Bar No. 1877
1100 East Bridger Ave.
Las Vegas, Nevada  89101
Telephone:  (702) 333-7777
Facsimile:  (702) 384-5731
suecash@live.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was forwarded by electronic means through the Court's ECF System to all counsel of record, as follows:

Chad R. Fears, Esq.
Snell & Wilmer, LLP
3883 Howard Hughes Pkwy
Las Vegas, NV  86169
cfears@swlaw.com

Craig Logsdon, Esq.
Snell & Wilmer, LLP
400 E. Van Buren St.
Phoenix, AZ 85004
clogsdon@swlaw.com

Patrick X. Fowler, Esq.
Snell & Wilmer, LLP
400 E. Van Buren St.
Phoenix, AZ  85004
pfowler@swlaw.com

Alex B. Marconi, Esq.
400 E. Van Buren St.
Phoenix, AZ  85004
amarconi@swlaw.com
(*Pro Hac Vice*)

By: /s/  Sam Harding
Sam Harding, Esq.

# EXHIBIT 1

# SAM HARDING LAW FIRM

SAM HARDING ESQ

1100 E Bridger Avenue
Las Vegas, Nevada 89101
www TheGoodGuy com

Phone (702) 384 8023
Fax (702) 541 9811

**August 27, 2009**

VIA E-MAI (ken@arnoldoffice com)

Mr Ken Harris
Adjustor for Seven Crown Resorts

Re      Our Client        Joshua Murphy
        Our File No       208740
        Date of Loss      8/20/2009

Dear Mr Harris

It was a pleasure speaking with you on the phone on this date

As you are aware my office has been retained to represent the family of Joshua Murphy regarding his death which occurred on August 20 2009

It is my understanding that you are the adjustor for Seven Crown Resorts who rented the houseboat to Mr Michael Browning  Mr Browning rented a Summit Houseboat (confirmation # E86K1) from Seven Crown Resorts  It is our present understanding that Mr Browning's son died on August 20, 2009  as a result of carbon monoxide poisoning most likely from the generator

You have represented that the involved Summit Houseboat is secured and being maintained in the condition which it was in when it was received from the Coast Guard who initially had custody of the boat following the incident on August 20, 2009  **I would request that the boat be maintained in a secure environment in the condition it was in when received from the Coast Guard and that there be no destructive testing done until such time as we can both have our experts present**

You have advised me that "Tiger Team" will be coming to inspect the boat this coming Monday at noon  August 31 2009  Unfortunately, I will most likely not have sufficient time to arrange for experts on behalf of the family to be there that quickly  It is my understanding from you that no destructive testing will be done on the Houseboat at the time of this examination

As you are aware I have requested that you advise me as to the liability policy limits of Seven Crown Resorts including both primary and excess coverages

Thank you for your anticipated cooperation in this matter

Very truly yours,

SAM HARDING LAW FIRM

Samuel A Harding, Esq

SAH/lc

**SAM HARDING LAW FIRM**

SAM HARDING  ESQ

1100 E  Bridger Avenue
Las Vegas, Nevada 89101
www TheGoodGuy com

Phone (702) 384 8023
Fax (702) 541 9811

**August 27, 2009**

VIA E-MAI (ken@arnoldoffice com)

Mr  Ken Harris
Adjustor for Seven Crown Resorts

Re      Our Client         Joshua Murphy
        Our File No        208740
        Date of Loss       8/20/2009

Dear Mr  Harris

It is my understanding that the "Tiger Team Report  inspection is this coming Monday  August 31, 2009, at noon, at Seven Crown Resorts   Unfortunately, neither I nor my experts will be able to attend this inspection on such short notice

However, I plan on having two representatives come for the purposes of taking pictures and videos of the boat and the inspection which takes place on that date   Please advise if you have any objection to this   The two individuals who will be appearing are Ms  Stacey Cash and Ms  LeAnn Carter

Ms  Cash or Ms  Carter will call you relative to further directions to the location of the houseboat

Very truly yours,

SAM HARDING LAW FIRM

Samuel A Harding, Esq

SAH/lc

EXHIBIT 2

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



# AUTOPSY REPORT

**Case Number: 09-06671**

August 21, 2009

## AUTOPSY REPORT

PATHOLOGIC EXAMINATION ON THE BODY OF

**JOSHUA MURPHY**

### FINAL PATHOLOGIC FINDINGS

I.   Carbon monoxide poisoning, carbon monoxide level 44.2%.
II.  Drowning.
    A.   Was on a raft near a houseboat generator.
    B.   Found deceased in the water.
    C.   Frothy, blood-tinged purge within the oropharynx.

### OPINION

**CAUSE OF DEATH:** It is my opinion that this 11-year-old Caucasian male, Joshua Murphy, died as a result of carbon monoxide poisoning. Other significant conditions include drowning.

**MANNER OF DEATH:** ACCIDENT.

*Alane M. Olson* 10/20/09
Alane M. Olson, M.D.
Pathologist

AO/jtk/amu

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Joshua Murphy (deceased) 16.1 Production
000001

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000001

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number: 09-06671**

August 21, 2009

### POSTMORTEM EXAMINATION ON THE BODY OF

### Joshua Murphy

The examination commences at 1015 hours on 21 August 2009.

### IDENTIFICATION

At the time of autopsy, the body is identified by a Clark County Coroner/Medical Examiner "toe tag" inscribed with case #09-6671 and the name Murphy, Joshua. Additional identification consists of a hospital band on the left wrist bearing account number 0006814419 John Doe.

### CLOTHING

At the time of autopsy, the body is lying upon the cut remnants of a pair of floral print swim trunks.

### GENERAL EXTERNAL EXAMINATION

The body is that of a normally developed, teenage Caucasian male measuring 60 inches in length and weighing 90 pounds. The general appearance is roughly consistent with the chronological age of 11 years. The body is in full rigor and cool following refrigeration. Lividity is posterior, bright pink, and blanching to pressure. The state of preservation is good in this unembalmed body.

**HEAD**: The scalp is covered with straight ash brown hair measuring to no more than approximately 10 cm in length, with some admixed fine silt or sand. The head is normocephalic and atraumatic. **EARS**: The ears are normally formed and set, the external auditory canals are clear, and the lobes are free of cosmetic perforations. **EYES**: The irides are brown, and the pupils are round and equal. The sclerae and conjunctivae are free of icterus and petechiae. **NOSE**: The nasal bridge and septum are midline and intact, and blood-tinged purge is present within the nares. **FACE**: The face is unremarkable. **MOUTH**: The

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Joshua Murphy (deceased) 16.1 Production
000002

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000002

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



## AUTOPSY REPORT

**Case Number: 09-06671**

PAGE TWO

lips and oral mucosa are free of discernible acute injuries. There is frothy blood-tinged purge present within the oral cavity. The dental arches contain natural teeth in good repair. In the central mouth is the cut remnant of an endotracheal tube. The visible portion of the tongue is free of injuries. **NECK**: The larynx and trachea are midline and intact to palpation, and the neck is free of discernible acute injuries.

**CHEST AND BACK**: The chest and back are normally formed, bilaterally symmetric, and have a normal anteroposterior diameter. **ABDOMEN**: The abdomen is scaphoid, firm, and free of discernible organomegaly. **GENITALIA**: The external genitalia are those of a circumcised adolescent male with bilaterally descended testes. The genital hair pattern is appropriate for age and sex. **ANUS AND PERINEUM**: The anus and perineum are unremarkable aside from smeared fecal matter.

**EXTREMITIES**: The upper extremities are normally formed, bilaterally symmetric, and remarkable for described changes. No digits are missing. The fingernails are short, natural, and generally clean. The lower extremities are normally formed, bilaterally symmetric, and remarkable for described changes.

### EVIDENCE OF MEDICAL/SURGICAL INTERVENTION

EKG and pacing patches are present on the body surfaces. There is a rigid cervical collar present in the body bag with the body. An intraosseous catheter is present on the right lower leg. A pulse oximeter sensor is present on the right great toe.

### IDENTIFYING MARKS, SCARS AND TATTOOS

None.

### EVIDENCE OF INJURY

On the dorsal lateral left hand is a vertical parchment-like dried superficial abrasion which is 6 mm in length. Two

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Joshua Murphy (deceased) 16.1 Production
000003

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000003



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**AUTOPSY REPORT**

**Case Number: 09-06671**

PAGE THREE

punctate superficial abrasions are present on the dorsal aspect of the right hand and middle finger. Superficial abrasions (two) are present on the right knee, linear, and measuring to no more than 1 cm in maximum individual dimension. About the left ankle are two superficial abrasions, varying from 5 mm to 2 cm in length. On the mid anterolateral left lower leg is a vertical scratch like superficial abrasion, approximately 4 cm in length. On the dorsal left foot and toes are two scattered superficial abrasions, varying from punctate to 6 mm in maximum dimension. On the upper chest are areas of superficial abrasion and discoloration in the skin, presumably incident to resuscitative efforts. On the distal left flank, overlying the left anterior-superior iliac crest is a superficial ovoid abrasion which is 2.5 cm in maximum dimension. On the central mid back is an irregular superficial abrasion, measuring to no more than 1 cm in length.

### GENERAL INTERNAL EXAMINATION

**PRIMARY INCISIONS:** The body is opened with thoracoabdominal and intermastoid incisions. The thoracic musculature is red-brown and not hemorrhagic. The abdominal panniculus is uniform and yellow, and the subcutaneous fat layer of the anterior abdominal wall is 2.0 cm thick.

**BODY CAVITIES:** The organs of the thoracic and abdominal cavities are in their usual locations, and bear normal anatomic relationships to each other. The pericardial, pleural, and peritoneal cavities are free of adhesions and effusions. No organs are surgically absent.

**MEDIASTINUM:** The mediastinum is not enlarged or hemorrhagic, and there is no lymphadenopathy.

**HEART AND GREAT VESSELS:** The 240 gram heart has a normal size and shape. The epicardium is smooth and translucent, and the subepicardial fat is normally disposed. The coronary arteries arise and course normally in a right dominant fashion, and the

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Joshua Murphy (deceased) 16.1 Production
000004

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000004



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**AUTOPSY REPORT**

**Case Number: 09-06671**

PAGE FOUR

lumina are free of atherosclerosis and thromboses. The atria
are not enlarged or dilated. The fossa ovalis is closed. The
cardiac valves have the usual number of cusps, which are
unremarkable. The ventricles are neither thickened nor dilated,
and the ventricular myocardium is firm and red-brown throughout,
without evidence of infarct or infiltrates. The
interventricular septum is intact and not asymmetrically
thickened. The endocardium is smooth, translucent, and free of
mural thrombi. The aorta and its major branches arise and
course normally, and are free of atherosclerotic plaque. The
systemic veins are unremarkable.

**LUNGS**: The right lung weighs 460 grams and the left lung weighs
430 grams. The pleural surfaces are smooth, translucent and
free of adhesions, with indiscernible subpleural anthracotic
pigment deposition. The parenchyma is generally well aerated
throughout, and serial sectioning reveals a patchy congestion
pattern throughout both lungs. The pale tan bronchi are free
of occlusive secretions and mural lesions. The pulmonary
arteries are unremarkable. The hilar lymph nodes are not
enlarged, and have anthracotic cut surfaces.

**HEPATOBILIARY**: The 1060 gram liver has a smooth, translucent,
intact capsule covering firm, purple parenchyma which is free of
fibrosis, cholestasis, and tumor. The biliary tract is not
dilated, and the portal and hepatic veins are patent. The
gallbladder contains approximately 5 cc of viscid green bile
which is devoid of concretions. The mucosa is velvety and
unremarkable. The cystic and common bile ducts are
unremarkable.

**GASTROINTESTINAL**: The esophagus is of uniform caliber, and is
lined by smooth, tan mucosa. The gastroesophageal junction is
unremarkable. The stomach is lined by smooth, tan mucosa having
the usual rugal folds, and contains approximately 20 cc of
opaque tan fluid with suspended white fragments
(unidentifiable). The mucosa is devoid of masses and lesions.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**AUTOPSY REPORT**

**Case Number: 09-06671**

PAGE FIVE

The small and large bowel are unremarkable. The appendix is present and unremarkable.

**GENITOURINARY:** The kidneys weigh 100 grams each. The capsules are smooth and translucent, and strip with ease from the underlying firm, red-brown cortical surfaces. The cortices are well demarcated from the striated pyramids. The papillae are not blunted, and the renal pelves and ureters are unremarkable. The urinary bladder contains approximately 50 cc of clear, yellow urine.

**ENDOCRINE:** The adrenal glands have uniform, yellow cortices, averaging less than 0.2 cm thick. The gray medullae are intact. The pink-tan pancreas has the usual lobular architecture, and is free of fibrosis, fat necrosis, cysts, tumors, and hemorrhage. The red-brown thyroid has a normal size and shape, and the parenchyma is unremarkable.

**RETICULOENDOTHELIAL SYSTEM:** The 190 gram spleen has a smooth, translucent, intact capsule covering firm, purple parenchyma which has the usual white pulp architecture. The aortic, cervical, and mesenteric lymph nodes are not enlarged.

**HEAD:** The reflected scalp is not hemorrhagic. The calvarium and base of the skull are intact. The dura mater and falx cerebri are intact, and there is no epidural or subdural hemorrhage. The cranial nerves are intact. The vessels of the circle of Willis arise and course normally, and are unremarkable. The pattern of cerebral gyri and sulci is normal, though there is moderate cerebral edema, with widening of the gyri and narrowing of the sulci. Subarachnoid hemorrhage is absent, and the leptomeninges are thin and translucent. The 1430 gram brain is symmetric, and serial sections of the cerebrum, cerebellum, and brainstem are intact, with normal architecture. There are no masses or healed infarcts. The ventricles are neither dilated nor hemorrhagic. The pineal and pituitary glands are unremarkable.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Joshua Murphy (deceased) 16.1 Production
000006

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000006

**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**



**AUTOPSY REPORT**

**Case Number: 09-06671**

PAGE SIX

**SPINAL CORD**: The cervical spine is stable to manipulation. The cervical spinal cord, as viewed from the cranial cavity, is unremarkable. Internal examination of the entire length of the vertebral column fails to reveal evidence of acute injury.

**NECK**: The soft tissues of the neck, including the skeletal musculature of the tongue, are not hemorrhagic. The hyoid bone is intact and well ossified. The larynx and trachea are widely patent and free of aspirated foreign body material.

**MUSCULOSKELETAL SYSTEM**: The bony framework and soft tissues are unremarkable.

**SPECIMENS**: Routine stock tissue. Blood, urine, and vitreous are retained for toxicology. A DNA blood spot card is made during the course of the autopsy.

**EVIDENCE**: None.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Joshua Murphy (deceased) 16.1 Production
000007

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000007

**Clark County Coroner/Medical Examiner**
1704 Pinto Lane
Las Vegas, NV  89106
(702) 455-3210


CORONER

**REPORT OF INVESTIGATION**
**Coroner Case**

| CALL INFO | | | | |
|---|---|---|---|---|
| NAME OF DECEASED (LAST, FIRST MIDDLE)<br>**Murphy, Joshua** | | AKA | | CASE NUMBER<br>**09-06671** |
| INVESTIGATOR<br>Lara D. Davies | REPORTED BY<br>Rachel Neubauer, RN | REPORTING AGENCY<br>University Medical Center | | REFERENCE NUMBER<br>002233026 |
| CALL DATE AND TIME<br>8/20/2009 11:30:00 PM | DISPATCH DATE AND TIME<br>8/21/2009 2:20:00 AM | ARRIVAL DATE AND TIME<br>8/21/2009 2:25:00 AM | | RETURN DATE AND TIME<br>8/21/2009 2:50:00 AM |

| DECEDENT | | | | | |
|---|---|---|---|---|---|
| DATE AND TIME OF DEATH<br>**8/20/2009 11:20:00 PM** | AGE<br>11 Yrs | | GENDER<br>Male | RACE<br>Caucasian | VET? ☐ |
| RESIDENT COUNTY<br>Deer Lodge | TELEPHONE NO.<br>(999) 999-9999 | | DATE OF BIRTH<br>4/25/1998 | | |
| SOCIAL SECURITY NO.<br>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 | DRIVER'S LIC. NO. AND STATE | OCCUPATION | | EMPLOYER | |
| MARITAL STATUS<br>Single | HEIGHT<br>60 | WEIGHT<br>90 | EYE COLOR<br>Brown | | HAIR COLOR<br>Brown |
| CLOTHING<br>blue & white shorts | | | SCARS/TATTOOS/MARKS<br>// | | |

| DEATH | | |
|---|---|---|
| LOCATION OF DEATH<br>University Medical Center Pediatrics ER | | AT RESIDENCE ☐ |
| ADDRESS (STREET, CITY, STATE, ZIP)<br>1800 W. Charleston Blvd.  Las Vegas, NV  89102 | COUNTY<br>Clark | |
| ☑ PRONOUNCED BY<br>Dr. Burnette | AGENCY<br>University Medical Center | |

| INCIDENT | | |
|---|---|---|
| LOCATION OF INCIDENT<br>Pump House Cove | | AT WORK ☐ |
| ADDRESS (STREET, CITY, STATE, ZIP)<br>36°17.9856N x 114°24.2664 Las Vegas, NV | COUNTY | |
| DATE AND TIME OF INCIDENT<br>8/20/2009 8:37:00 PM | INVESTIGATING AGENCY<br>National Park Service | OFFICERS<br>Agent Johnson, Agent Raynold |

| NOTIFICATION | | |
|---|---|---|
| LEGAL NEXT OF KIN<br>Jodie Murphy | RELATIONSHIP<br>Mother | TELEPHONE NO.<br>(999) 999-9999 |
| NOTIFIED BY<br>Michael Browning | METHOD<br>Telephone | DATE AND TIME |
| NAME OF PERSON NOTIFIED<br>Jodie Murphy | RELATIONSHIP<br>Mother | TELEPHONE NO.<br>(999) 999-9999 |
| IDENTIFIED BY<br>Michael Browning | METHOD<br>Viewing | DATE AND TIME<br>8/21/2009 2:25:00 AM |

| DISP | | |
|---|---|---|
| TRANSPORTED TO MORGUE BY<br>Desert Memorial Cremation & Burial | TRANSPORTED TO MORTUARY BY<br>Desert Memorial Cremation & Burial | |
| FUNERAL HOME | CLOTHING RELEASED<br>☑ Yes    ☐ No | |
| TYPE OF EXAM<br>Autopsy | EXAM BY<br>Alane Olson, M.D. | |

| VEHICULAR | |
|---|---|
| DECEDENT WAS<br>☐ Pedestrian  ☐ Driver  ☐ Passenger  ☐ Bicyclist  ☐ Motorcyclist  ☐ Skateboard  ☐ Motorized Wheelchair | |
| VEHICLE | LICENSE NUMBER          STATE |
| OCCURRED ON PRIVATE PROPERTY   DECEDENT WEARING SEATBELT?   SEAT POSITION   DECEDENT WEARING CRASH HELMET? | |

Joshua Murphy (deceased) 16.1 Production
000008

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000008

**Clark County Coroner**
1704 Pinto Lane
Las Vegas, NV 89106
(702) 455-3210



**REPORT OF INVESTIGATION**

**Case Number: 09-06671**

| | | | |
|---|---|---|---|
| **DECEDENT NAME:** | Joshua Murphy | **DATE OF BIRTH:** | 4/25/1998 |
| **ALSO KNOWN AS:** | | **AGE:** | 11 |
| **LOCATION OF DEATH:** | University Medical Center Pediatrics ER | **SSN:** | 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 |
| **DATE OF DEATH:** | 08/20/2009 | **TIME OF DEATH:** | 11:20PM |

## SUMMARY OF INVESTIGATION

**Reason for Coroner Jurisdiction:**
National Park Service (NPS) – Apparent Drowning

**Circumstances of Death:**
On 08/20/09, at approximately 2020 hours the decedent was floating on a raft next to the houseboat near the running generator on the back of the boat in Pump House Cove at Lake Mead. His father was cooking dinner and yelled out to the decedent to tell him that dinner would be ready in a few minutes. The father turned around and when he looked back he did not see the decedent. The father and other family members looked inside the houseboat for the decedent but could not locate him. Approximately 5 minutes later the father saw the decedent in the water next to the boat face down. The father pulled the decedent onto the boat and initiated Cardiopulmonary Resuscitation (CPR). 911 was called at approximately 2037 hours. Overton Rescue responded and moved the decedent from the boat to Echo Bay where the decedent was then airlifted to University Medical Center ER (UMC) arriving at approx. 2317 hours. Medical intervention was met with negative results and death was pronounced by Dr. Burnette at 2320 hours on 08/20/09.

**Medical History:**
Med Hx: Per the father the decedent was very healthy and has not complained of feeling ill.

**Scene:**
Death Scene: University Medical Center Pediatrics ER, Room 11 located at 1800 W. Charleston Blvd. in Las Vegas Nevada.

Incident Scene: Pump House Cove at Lake Mead. GPS coordinates 36°17.9856N x 114°24.2664

**Body:**
I viewed a Caucasian male lying supine on a standard hospital bed. He was covered with 2 white blankets and was clad in blue and white shorts. I noted an intubation tube in the decedent's mouth and a c-collar around his neck. There was a dried brown substance covering the decedent's face. I noted defibrillator and tracer pads on the decedent. There was a white plastic blood pressure cuff around his right upper arm. There was a white medical bracelet around the decedent's left wrist. There was a clear tube inserted into his right lower leg. The decedent's skin was cool to the touch. Lividity appeared to be blanching posterior and rigor mortis was present.

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Signature: _____
Lara D. Davies, Coroner Investigator

Joshua Murphy (deceased) 16.1 Production
000009

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000009



**Clark County Coroner**
**1704 Pinto Lane**
**Las Vegas, NV 89106**
**(702) 455-3210**

**REPORT OF INVESTIGATION**

**Case Number:** 09-06671

The decedent was removed and transported to the Clark County Office of the Coroner/Medical Examiner (CCOCME) by Desert Memorial per rotation.

## Property:
Property Receipt # 98829 shows that no property was taken.

## Forensic Issues and Reasons for Seal:
- Call NPS Officer Chris Raynolds for autopsy
- A&N Keagly differed interest in this case.
- UMC Medical Records obtained
- CPS form faxed
- Decedent was floating on a raft next to the running generator on the back of the boat.
- Decedent was reportedly a very good swimmer
- No admit blood or x-rays taken

## Witnesses and Information Sources:
NPS Agent G. Johnson
NPS Agent C. Raynolds
Rachel Neubauer, RN
Michael Browning, father
Tina Browning, stepmother

## Narrative:
Today, 08/20/09 at approximately 2330 hours I received a call of an apparent death occurring at UMC Pediatrics ER. The call was reported by Rachel Neubauer, RN with UMC. At this time Rachel Neubauer, RN had no information regarding this case and the decedent was a John Doe. I called NPS and they were still in the process of interviewing the family members and advised me they would call me back with the information regarding this case. I spoke with CCOCME Supervisor Archer who advised that I should wait until I had full details before responding to the hospital and that I should wait until the family arrived at UMC. I then telephoned Abuse and Neglect and spoke to Cheryl Keagley who differed interest in this case as the incident occurred in NPS jurisdiction.

At approximately 0100 hours I received a call from NPS Agent Johnson who advised this was NPS case number 092562. He provided me with the circumstances noted above. Agent Johnson stated that the family was now en-route to the hospital. I then telephoned Rachel Neubauer, RN and advised her that the family was on their way, she advised she would telephone the CCOCME when they had arrived so that this investigator could respond.

Upon, my arrival, at approximately 0225 hours I was met by Rachel Neubauer, RN who advised that the decedent's family was in the room with the decedent. I then spoke to Michael and Tina Browning who confirmed the above listed circumstances and provided me with the medical history noted above. Mr. Browning

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Signature: _____
Lara D. Davies, Coroner Investigator

2 of 3

Joshua Murphy (deceased) 16.1 Production
000010

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000010

**Clark County Coroner**
1704 Pinto Lane
Las Vegas, NV 89106
(702) 455-3210



**REPORT OF INVESTIGATION**

Case Number: 09-06671

could not provide me with the decedent's mother's phone number at this time as it was in his cell phone but he asked that he be the one to notify her of their son's demise. I provided Mr. Browning with all necessary information regarding this case and returned to the CCOCME at 0250 hours on 08/21/09.

**Special Requests:**
None

**Tissue/Organ Donation:**
Nevada Donor Network (NDN) protocol followed.
DMS

*Dissemination is restricted.*
*Secondary dissemination of this document is prohibited.*

Signature: _____
Lara D. Davies, Coroner Investigator

Joshua Murphy (deceased) 16.1 Production
000011

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000011



Quest
Diagnostics
®

4230 Burnham Av
Las Vegas, Nevada 891
(702) 733-78

| PATIENT | MURPHY 09-6671, JOSHUA | ROUTE | PSRN | 1084 |

AGE/SEX 11Y   M
COLLECTED 08/21/2009 10:10
RECEIVED 08/24/2009 08:52

REFERRED BY
ACCESSION NO. 01630977
MED. RECORD NO. 0024327865
CHART NO.

CC CORONERS OFFICE PO55240
1704 PINTO LANE
LAS VEGAS, NV 89106

| TEST | RESULTS | ABN | REFERENCE RANGE | UNITS | LOW | NORMAL | HIGH |

Attached are the hardcopy(s) of the reference lab work requested.
Separate Quest Diagnostics reports previously issued.

09-08-09 10:24 RCVD

Joshua Murphy (deceased) 16.1 Production
000012

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000012



NMS Labs                                    **CONFIDENTIAL**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, DABFT, DABCC-TC, Laboratory Director

## Toxicology Report

**Report Issued**  09/02/2009 12:01

To:  **60133**
     Quest Diagnostics Inc.
     Attn: Lab Services
     4230 South Burnham Avenue
     Las Vegas, NV  89119

| | |
|---|---|
| **Patient Name** | MURPHY, JOSHUA (09-6671) |
| **Patient ID** | 01630977 |
| **Chain** | 11079041 |
| **Age** | 11 Y |
| **Gender** | Male |
| **Workorder** | 09187952 |
| **Page 1 of 6** | |

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Carboxyhemoglobin | 44 | % | Heart Blood |
| Atropine | Positive | ng/mL | Peripheral Blood |
| Caffeine | Positive | mcg/mL | Peripheral Blood |
| Acetaminophen | 5.2 | mcg/mL | Peripheral Blood |
| Diphenhydramine | 160 | ng/mL | Peripheral Blood |
| Dextro / Levo Methorphan | 9.1 | ng/mL | Peripheral Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 1005B | Carbon Monoxide Profile, Blood (Forensic) |
| 8052B | Postmortem Toxicology - Expanded, Blood |

### Tests Not Performed:

Part or all of the requested testing was unable to be performed. Refer to the **Analysis Summary and Reporting Limits** section for details.

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Gray Top Tube | 10.5 mL | 08/21/2009 10:10 | Peripheral Blood | |
| 002 | Gray Top Tube | 10.5 mL | 08/21/2009 10:10 | Peripheral Blood | |
| 003 | Gray Top Tube | 10.5 mL | 08/21/2009 10:10 | Peripheral Blood | |
| 004 | Gray Top Tube | 10 mL | 08/21/2009 10:10 | Peripheral Blood | |
| 005 | Green Vial | 6 mL | 08/21/2009 10:10 | Heart Blood | |
| 006 | Green Vial | 4 mL | 08/21/2009 10:10 | Heart Blood | |
| 007 | Gray Top Tube | 11 mL | 08/21/2009 10:10 | Heart Blood | |
| 008 | Gray Top Tube | 9 mL | 08/21/2009 10:10 | Heart Blood | |
| 009 | Red Vial | 3 mL | 08/21/2009 10:10 | Vitreous Fluid | |
| 010 | Green Plastic Container | 50 mL | 08/21/2009 10:10 | Urine | |

All sample volumes/weights are approximations.

Specimens received on 08/25/2009.

v.5

Joshua Murphy (deceased) 16.1 Production
000013

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000013



CONFIDENTIAL

| Workorder | 09187952 |
| Chain | 11079041 |
| Patient ID | 01630977 |

*Case # 09-6671*

Page 2 of 6

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Carboxyhemoglobin | 44 | % | 2.0 | 005 - Heart Blood | SP |
| Atropine | Positive | ng/mL | 12 | 001 - Peripheral Blood | GC/MS |
| Caffeine | Positive | mcg/mL | 0.10 | 001 - Peripheral Blood | GC/MS |
| Acetaminophen | 5.2 | mcg/mL | 0.50 | 001 - Peripheral Blood | HPLC |
| Diphenhydramine | 160 | ng/mL | 50 | 001 - Peripheral Blood | GC |
| Dextro / Levo Methorphan | 9.1 | ng/mL | 5.0 | 001 - Peripheral Blood | GC |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

## Reference Comments:

1. **Acetaminophen (Tylenol®) - Peripheral Blood:**

   Acetaminophen is an over the counter analgesic with antipyretic properties; however, it has no anti-inflammatory actions. It may be found both alone and in combinations with other substances such as codeine, hydrocodone, tramadol, butalbital, and propoxyphene. It appears to be a relatively safe substance when used in analgesic amounts; however, it frequently produces acute hepatic necrosis after overdose.

   The generally accepted therapeutic range of acetaminophen is 10 - 20 mcg/mL of plasma; however, there are considerable individual differences in plasma concentrations.

   Symptoms of acetaminophen overdose usually are not seen immediately but are reflected in hepatic damage after 1/2 to 6 days with concentrations of 120 mcg/mL and above. A reported range of blood levels in individuals succumbing to acetaminophen overdose ranged from 160 - 390 mcg/mL.

2. **Atropine (d,l-Hyoscyamine) - Peripheral Blood:**

   Atropine is an anticholinergic alkaloid used in pre-anesthetic therapy to control airway secretions and as an antispasmodic to control gastrointestinal spasms. It is frequently used as an antidote in the treatment of anticholinesterase-type pesticides. It can be obtained naturally from deadly nightshade or jimson weed. Atropine is also used in resuscitative attempts.

   Following a single IM 1.0 mg dose of atropine, peak plasma concentrations of approximately 3 ng/mL were attained in 30 min.

   Toxic effects of atropine have considerable individual variation; however, at high doses, signs and symptoms include mydriasis, hot dry reddened skin, delirium and hallucinations. Death has been reported with a concentration of 200 ng/mL in blood and 1500 ng/mL in urine.

   In resuscitative failure, most of the administered drug remains confined to the intravascular injection pathway. Often the drug is still present in the postmortem blood collected from the heart sampled at autopsy.

   The reported qualitative result for this substance is indicative of a finding commonly seen following a resuscitative attempt and is usually not toxicologically significant.

Joshua Murphy (deceased) 16.1 Production
000014

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000014



CONFIDENTIAL

| | |
|---|---|
| **Workorder** | 09187952 |
| **Chain** | 11079041 |
| **Patient ID** | 01630977 |

*Case #09-6671*

**Page 3 of 6**

## Reference Comments:

3. Caffeine (No-Doz) - Peripheral Blood:

Caffeine is a xanthine-derived central nervous system stimulant. It also produces diuresis and cardiac and respiratory stimulation. It can be readily found in such items as coffee, tea, soft drinks and chocolate. As a reference, a typical cup of coffee or tea contains between 40 to 100 mg caffeine.

Following the oral ingestion of 120 and 300 mg of caffeine, reported peak plasma concentrations of the drug averaged 3.0 mcg/mL (range, 2.0 - 4.0 mcg/mL) and 7.9 mcg/mL (range, 6.0 - 9.0 mcg/mL), respectively. A single oral dose of 500 mg produced a reported peak plasma concentration of 14 mcg/mL after 30 min.

Reported concentrations of caffeine in caffeine-related fatalities averaged 183 mcg/mL (range, 79 - 344 mcg/mL).

The reported qualitative result for this substance is indicative of a finding commonly seen following typical use and is usually not toxicologically significant.

4. Carboxyhemoglobin (COHb) - Heart Blood:

Hemoglobin is a protein found in red blood cells that is responsible for the oxygen carrying capacity of blood. In normal conditions, hemoglobin receives oxygen via blood circulation through the lungs and delivers the oxygen to tissues and organs throughout the body. In situations where the inspired air is high in carbon monoxide concentration, the hemoglobin then binds the carbon monoxide in place of oxygen. This leads to a functional deficiency in oxygen delivery to the organs and tissues of the body.

Measurement of carbon monoxide hemoglobin saturation gives an indication of the carbon monoxide concentration in the inspired air and its possible sequelae. Normal endogenous carboxyhemoglobin levels are generally up to 4% in non-smokers and up to 8% in smokers (although it may be higher); toxic symptoms may be noted at levels >10%. Concentrations over 10% saturation have been reported to produce adverse effects, e.g., headache and nausea. Deaths from carbon monoxide, in the absence of resuscitative measures, generally have associated carboxyhemoglobin levels >40%. However, individuals with a compromised cardiovascular system are at a potentially greater risk of toxic effects at much lower carbon monoxide hemoglobin saturation values.

5. Dextro / Levo Methorphan - Peripheral Blood:

Dextromethorphan (DM) is the d-isomer of a synthetic codeine analog that has antitussive activity, but is without a significant analgesic effect. The drug is frequently found as a constituent of cough and cold medications for adults and children that are available over-the-counter. Oral doses range from 5 to 120 mg per day.

DM is metabolized in the liver to a few products including dextrorphan, a pharmacologically active antitussive. Genetic polymorphism exists for the rate and extent of DM metabolism. Rapid metabolizers show a mean elimination half-life of 3.4 hours while slow metabolizers (about 10% of the population) exhibit half-lives that may exceed 24 hours. Dextrorphan is generally not observed in the bloodstream; free DM, free dextrorphan, and conjugated dextrorphan are eliminated in the urine.

Following a single oral 20 mg dose, peak serum DM concentrations averaged 2 ng/mL after 2.5 hours. With chronic doses of 30 mg 4 times daily for 7 days, the mean peak plasma DM concentration was 2.4 ng/mL in extensive metabolizers and approximately 200 ng/mL in poor metabolizers.

Overdose with DM is rare, however, toxicity (which may include death) is usually manifested when doses exceed 100 times the normal adult dose. The observed symptoms include central nervous system depression, hallucinations, dizziness and ataxia. Fatalities have been reported at dextromethorphan concentrations as low as 3300 ng/mL in blood.

This test is not chiral specific; therefore, Dextromethorphan and/or Levomethorphan may be present.

6. Diphenhydramine (Benadryl®) - Peripheral Blood:

Diphenhydramine is an antihistamine with sedative and anti-emetic effects. It is rapidly absorbed following oral administration; however, it is frequently given IV. Patients taking this medication are usually warned against the operation of complicated machinery, because of its strong sedative effects.

Following a single 50 mg oral dose of diphenhydramine, peak plasma concentrations at 3 hr averaged 80 ng/mL. A reported steady-state diphenhydramine concentration is 300 ng/mL.

v.5

Joshua Murphy (deceased) 16.1 Production
000015

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000015



CONFIDENTIAL        **Workorder** 09187952        *Case #09-0671*
                    **Chain**     11079041
                    **Patient ID** 01630977

                    **Page 4 of 6**

**Reference Comments:**

Signs and symptoms of acute diphenhydramine toxicity include tremor, seizures, fever, respiratory depression and cardiac arrhythmias. Reported blood levels in fatal overdose cases ranged from 8000 - 31000 ng/mL and in urine from 40000 - 64000 ng/mL.

Lidocaine interferes with diphenhydramine in this analysis. The presence of lidocaine will adversely affect the quantitation of diphenhydramine. If lidocaine is a potential interferent in this case, call the laboratory for alternate quantitative procedures.

**Sample Comments:**

001    PHYSICIAN/PATHOLOGIST NAME: OLSON

Upon completion of analysis, evidence was returned under chain of custody to the Referral Laboratory.

Workorder 09187952 was electronically signed on 09/02/2009 11:56 by:

Edward J. Barbieri, Ph.D.
Forensic Toxicologist

**Analysis Summary and Reporting Limits:**

Acode 1005B - Carbon Monoxide Profile, Blood (Forensic) - Heart Blood

-Analysis by Spectrophotometry (SP) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Carboxyhemoglobin | 2.0 % | | |

Acode 50000B - Acetaminophen Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by High Performance Liquid Chromatography (HPLC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetaminophen | 0.50 mcg/mL | | |

Acode 52005B - Antihistamines Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Azatadine | N/A | Methapyrilene | 100 ng/mL |
| Bromodiphenhydramine | 30 ng/mL | Orphenadrine | 50 ng/mL |
| Brompheniramine | 20 ng/mL | Pheniramine | 20 ng/mL |
| Carbinoxamine | 50 ng/mL | Promethazine | 30 ng/mL |
| Chlorcyclizine | 30 ng/mL | Pyrilamine | 30 ng/mL |
| Chlorpheniramine | 10 ng/mL | Tripelennamine | 40 ng/mL |
| Diphenhydramine | 50 ng/mL | Triprolidine | 30 ng/mL |
| Doxylamine | 50 ng/mL | | |

**Not Reported:** Azatadine: The analysis was unsuccessful due to an interfering substance in the submitted specimen.

Acode 52027B - Dextro/Levo Methorphan Confirmation, Blood (Forensic) - Peripheral Blood

v.5

Joshua Murphy (deceased) 16.1 Production 000016

Joshua Murphy (deceased) Plaintiffs' 16.1 Production 000016



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 09187952 |
| **Chain** | 11079041 |
| **Patient ID** | 01630977 |

*Case #09-6671*

**Page 5 of 6**

## Analysis Summary and Reporting Limits:

-Analysis by Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Dextro / Levo Methorphan | 5.0 ng/mL | | |

Acode 8052B - Postmortem Toxicology - Expanded, Blood - Peripheral Blood

-Analysis by Colorimetry (C) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetaminophen | 5.0 mcg/mL | | |

-Analysis by Colorimetry (C) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Salicylates | 200 mcg/mL | | |

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Methadone | 25 ng/mL |
| Benzodiazepines | 100 ng/mL | Opiates | 20 ng/mL |
| Cannabinoids | 10 ng/mL | Phencyclidine | 10 ng/mL |
| Cocaine / Metabolites | 20 ng/mL | Propoxyphene | 50 ng/mL |

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for: The following is a general list of compound classes included in the Gas Chromatographic screen. The detection of any particular compound is concentration-dependent. Please note that not all known compounds included in each specified class or heading are included. Some specific compounds outside these classes are also included. For a detailed list of all compounds and reporting limits included in this screen, please contact NMS Labs.

Amphetamines, Analgesics (opioid and non-opioid), Anesthetics, Anticholinergic Agents, Anticonvulsant Agents, Antidepressants, Antiemetic Agents, Antihistamines, Antiparkinsonian Agents, Antipsychotic Agents, Anxiolytics (Benzodiazepine and others), Cardiovascular Agents (non-digitalis), Hallucinogens, Hypnosedatives (Barbiturates, Non-Benzodiazepine Hypnotics and others), Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents (excluding Salicylate) and Stimulants (Amphetamine-like and others).

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 1.0 mg/dL | Isopropanol | 1.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

v.5

Joshua Murphy (deceased) 16.1 Production
000017

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000017



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 09187952 |
| **Chain** | 11079041 |
| **Patient ID** | 01630977 |

Case # 09-6671

**Page 6 of 6**

**Chain of Custody Information:**

| | |
|---|---|
| Courier: | FEDEX Standard Overnight |
| Delivery Date: | 8/25/2009 10:48:54 AM |
| Tracking Number: | 319090395100000373790355506620 |

**Sample Information:**

| ID | Receive Date | Received By |
|---|---|---|
| 001 | 8/25/2009 10:51:22 AM | Quackenbush, Erin |
| 002 | 8/25/2009 10:54:59 AM | Quackenbush, Erin |
| 003 | 8/25/2009 10:55:46 AM | Quackenbush, Erin |
| 004 | 8/25/2009 10:56:01 AM | Quackenbush, Erin |
| 005 | 8/25/2009 10:56:20 AM | Quackenbush, Erin |
| 006 | 8/25/2009 10:56:48 AM | Quackenbush, Erin |
| 007 | 8/25/2009 10:57:21 AM | Quackenbush, Erin |
| 008 | 8/25/2009 10:57:42 AM | Quackenbush, Erin |
| 009 | 8/25/2009 10:58:01 AM | Quackenbush, Erin |
| 010 | 8/25/2009 10:58:22 AM | Quackenbush, Erin |

v.5

Joshua Murphy (deceased) 16.1 Production
000018

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000018

# EXHIBIT 3

04-2642

# UNITED STATES DEPARTMENT OF THE INTERIOR
## NATIONAL PARK SERVICE
### INCIDENT RECORD

JUVENILE

PARK NAME: LAKE MEAD NRA

FORM 10-343
VERSION 1/1/2009

**INCIDENT**

| Incident Number: | Incident Date: Month: Day: Year: | Incident Time: Hour: Min: | Org code: | Reporting Officer ID |
|---|---|---|---|---|
| LAME 09-2562 | 08  20  2009 | 20 : 38 | 8360 | LAME 75 |

| Incident code | Description | Incident code | Description |
|---|---|---|---|
| 80-10-00 | Accident, Vessel | 86-00-00 | Death, Accidental |
| 96-10-00 | Search, Water Area | 91-00-03 | ALS Medical |
| | | | |
| | | | |

**INVOLVED PERSONS**

| | Name (LAST, First, Middle: | | Date Of Birth: | Phone (Business): |
|---|---|---|---|---|
| ☐ Suspect ☐ Complainant ☐ Witness ☒ Victim | Juvenile - See Attached | | | |
| | Address: | City: | State: Zip: | Phone (Home): |

| | Name (LAST, First, Middle: BROWNING, Michael Gene | | Date Of Birth: 12/01/1959 | Phone (Cell): 702-250-5156 |
|---|---|---|---|---|
| ☐ Suspect ☐ Complainant ☒ Witness ☐ Victim | Address: 6109 Breeders Cup ST | City: Las Vegas | State: NV  Zip: 89130 | Phone (Home): 702-395-7238 |

| | Name (LAST, First, Middle: BROWNING, Tina Marie | | Date Of Birth: 01/24/1961 | Phone (Cell): 702-278-3936 |
|---|---|---|---|---|
| ☐ Suspect ☐ Complainant ☒ Witness ☐ Victim | Address: 6109 Breeders Cup ST | City: Las Vegas | State: NV  Zip: 89130 | Phone (Home): 702-395-7238 |

| Vehicle- Vessel License: NV-3281-KF | State: NV | Color: Tan | Year: 1986 | Make: Master Fabricat | Model: Houseboat | ☐ Stolen ☐ Recovered ☐ Impounded |
|---|---|---|---|---|---|---|
| Vehicle- Vessel License: | State: | Color: Select | Year: | Make: | Model: | ☐ Stolen ☐ Recovered ☐ Impounded |
| Vehicle- Vessel License: | State: | Color: Select | Year: | Make! | Model: | ☐ Stolen ☐ Recovered ☐ Impounded |

**SUMMARY**

Narrative:
Additional Invovled Person:
Witness: PETTIE, James Dustin; DOB: 02/24/1990; Cell: 702-277-0152, Home: 702-395-7238; Address: 6109 Breeders Cup ST, Las Vegas, NV 89130.

Rescue 74 Medical Team:
1) Neel, Steve
2) Fox, Cody
4) Brown, Elwin

Echo Bay Marina Employees Finding Drug Paraphernalia:
1) O'Brien, Joel; HC-30 Box 30, Overton, NV 89040; Phone: 702-394-4101
2) Riggle, James; HC-30 Box 30, Overton, NV 89040; Phone: 702-394-4355

See Attached Report.

**RANGER**

| Reporting Officer's Name: Gregory Johnson | Supervisor's Name: Prashant Lotwala | |
|---|---|---|
| Reporting Officer's Signature: | Date: 08/29/2009 | Supervisor's Signature: | Date: 8-31-2009 |

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**NATIONAL PARK SERVICE**
**LAKE MEAD NATIONAL RECREATION AREA**
**SUPPLEMENTAL INCIDENT RECORD**

FORM 10-343A

| Incident Number: LAME 09-2562 | TYPE: Boat Accident, Fatal |
|---|---|

**SUMMARY:**
Fatal, eleven year old boy, preliminary cause of death carbon monoxide asphyxiation with drowning as
secondary. The incident occurred at an un-named cove, just north of Echo Bay, on the western side of the
lake on August 20, 2009 at approximately 2038 hours.

**ASSIGNMENT:**
I was assigned this case by Supervisory Ranger Clark.

**SCENE:**
The accident occurred in Lake Mead NRA, on Lake Mead, Overton Arm at N36°17.9753, W114°24.2664.
An un-named cove on the western side of Lake Mead, north of Echo Bay and south of Pump House Cove.
The lake depth was approximately eight feet in the area the victim was found. Lake Mead's water level on
August 20th was 1094.04 feet and on August 21st was 1094.09 feet.

The recorded water temperature on August 20th was 89°F (from Boulder Harbor). High and low air
temperatures on August 20th as recorded at the Echo Bay Ranger Station on the morning of August 21st were
108°F and 71°F respectively. The air temperature at the time of the accident was not available. Winds at the
time of the accident were calm. Skies were clear and it was a moonless night.

**VESSEL INFORMATION:**
Vessel#1:
Make: Master Fabricators
Model: Houseboat
Year: 1986
Color: tan/blue/green
Owner: Seven Crown Resort d/b/a Echo Bay Resort
Registration# NV-3281-KF
HIN: HLR01045E686
Insurance: Unknown

**INJURIES:**
**Juvenile**
Fatal, possible carbon monoxide asphyxiation with secondary as drowning. No other injuries noted.
Awaiting official report from Clark County Coroner's Office.

**NARRATIVE:**
On August 20, 2009 at approximately 2040 hours I was off duty and contacted at my residence by Lake
Mead Interagency Dispatch. The dispatcher advised me of an eleven year old boy unconscious and not
breathing, CPR in progress at the Echo Bay Marina, slip 224. Overton Rescue 74, Squad 74, Medic West

| Reporting Officer's Name | ID # | Supervisor's Name | ID # |
|---|---|---|---|
| Gregory Johnson | LAME75 | Prashant Lotwala | 2406 |
| Reporting Officer's Signature | Date | Supervisor's Signature | Date |
|  | 08/29/2009 |  | 8-31-2009 |

# UNITED STATES DEPARTMENT OF THE INTERIOR
## NATIONAL PARK SERVICE
## LAKE MEAD NATIONAL RECREATION AREA
## SUPPLEMENTAL INCIDENT RECORD

FORM 10-343A

| Incident Number: LAME 09-2562 | TYPE: Boat Accident, Fatal |
|---|---|

and Mercy Air 11 had also been dispatched by Clark County per Lake Mead Dispatch.  Ranger Dollinger
was also called out.

At approximately 2046 hours I arrived at the Echo Bay Marina head walk.  Within two to three minutes
Ranger Dollinger also arrived and staged in his vehicle to maintain radio communications with the
dispatcher.  I searched the dock area and announced myself several times upon arrival to the marina and did
not see or hear anyone respond.  Additionally, Ranger Dollinger made two announcements via his PA in his
patrol vehicle that also went unanswered.  By this time the Echo Bay Security Guard – Ledeel – arrived and
informed us that he had done a check of the marina earlier and no one was on the marina.  We advised
Ledeel of the situation and he advised that there was no slip number 224, hotel room 224 or site 224 either in
their campground or trailer village.  Ledeel then determined that there was a house boat number 224 that was
rented and out on the lake, however it was unknown where.

At approximately 2107 hours Rescue 74 received information from their dispatcher that the reporting party
was in houseboat 224.  At approximately 2113 hours Clark County Fire Dispatch advised that houseboat 224
was north of Echo Bay possibly Anchor or Pump House Cove Area.  At approximately 2126 hours Mercy
Air 11 had possibly located houseboat 224 just north of Echo Bay in a cove on the west shore.

At approximately 2129 hours Metro SAR was requested by Supervisory Ranger Clark to be available to
extricate the patient from the scene and transport the patient to the waiting Mercy Air 11 that had now landed
at the Echo Bay Launch Ramp to conserve fuel.

At approximately 2136 hours, I had Vessel 62 staged and a medical team from Rescue 74 on board and
awaiting a night operator at the Echo Bay Courtesy Dock.  At approximately 2151 hours, Ranger Martin a
qualified night boat operator arrived and we launched.

At approximately 2205 hours we were checking the area known as Pump House Cove and were advised that
the reporting party had seen our lights.  We were unable to locate any vessels in the area and turned back to
search the un-named cove north of Echo Bay and south of Pump House Cove.  Upon heading south at the
entrance of the cove we located a vessel with house lights on and a person flashing a flashlight in our
direction at approximately 2225 hours.

## ACTIONS TAKEN:
At approximately 2231 hours we made contact with the reporting party on their houseboat.  CPR was in
progress at the time on the rear deck of the houseboat.  The medical team from Rescue 74 immediately
boarded the boat and began patient care.  Ranger Martin and I secured our vessel to the house boat.  At
approximately 2233hours, Metro SAR Air 6 was overhead delivering a medic to load the patient and
transport him back to the Echo Bay Launch Ramp where Mercy Air 11 was waiting.  While on board the

| Reporting Officer's Name | ID # | Supervisor's Name | ID # |
|---|---|---|---|
| Gregory Johnson | LAME75 | Prashant Lotwala | 2406 |
| Reporting Officer's Signature | Date 08/29/2009 | Supervisor's Signature | Date 8-31-2009 |

# UNITED STATES DEPARTMENT OF THE INTERIOR
## NATIONAL PARK SERVICE
## LAKE MEAD NATIONAL RECREATION AREA
## SUPPLEMENTAL INCIDENT RECORD

FORM 10-343A

| Incident Number: LAME 09-2562 | TYPE: Boat Accident, Fatal |
|---|---|

houseboat I could smell the odor of alcoholic beverages and also noticed several empty beer cans on board the vessel.

House boat 224 was turned 180 degrees as a result of the rotor wash from Metro SAR Air 6 and broke free from the single line, originally off the port side that was secured to the beach. Metro SAR Air 6 extricated the patient and transported him to Mercy Air 11 waiting at the Echo Bay Launch Ramp. I secured the vessel via two lines to the shore. The family was loaded on board vessel 62 placed in PFDs and transported back to the Echo Bay Courtesy Dock.

At approximately 2334 I transported James Pettie and Ranger Dollinger transported Michael and Tina Browning from the Echo Bay Courtesy Dock to the Echo Bay Ranger Station to await confirmation on where **Juvenile** had been transported to. While there Michael Browning made a voluntary, un-solicited statement (see below).

After confirmation was made that **Juvenile** had been transported to UMC, the family was advised of this by Supervisory Ranger Clark at approximately 0010 hours. At approximately 0013hours Michael Browning took a voluntary PBT, administered by Ranger Dollinger, to determine if he was capable of safely driving to the hospital, it indicated a 0.095%BrAC. It was determined that Tina Browning should drive to the hospital and not Michael.

On the morning of August 21, 2009, Ranger Stolts, Supervisory Ranger Lotwala and I went back to the houseboat that was left over night. We found among other things meat that was located on the grill of the houseboat that had been partially cooked from the previous evening, along with other food that was left on the stove. Additionally, after we finished photographing the vessel and inspecting it at the location it was left the previous night, the houseboat was taken back to the Echo Bay Marina by Echo Bay Marina Employees. The marina employees were asked to remove the personal belongings from the vessel and store them for the family. While doing so, Joel O'Brien located in the top drawer in the bathroom a marijuana grinder and under the bunk beds in the middle of the cabin a bag containing tin foil with black soot on it. Further, James Riggle also located a pen that appeared to have been used to smoke something. They immediately contacted Supervisory Ranger Lotwala who contacted Ranger Stolts and I. Ranger Stolts and I immediately went to the houseboat and took possession of the items that appeared to be drug paraphernalia. The pen tube was later tested and found to be positive for Amphetamines and a secondary test indicated a positive result for codeine/morphine.

On August 24, 2009 while at the Browning residence at 6109 Breeders Cup ST conducting follow up interviews, Ranger Stolts noticed a marijuana plant growing in the back yard. I also observed the plant which was approximately 2½ feet tall. We questioned Michael about this and he replied substantially that: it was from several years ago, the kids threw some marijuana seeds in the soil there as a joke and now every year a plant sprouts. Usually, we don't let it get this tall, that it is pulled out earlier but we just forgot about

| Reporting Officer's Name | ID # | Supervisor's Name | ID # |
|---|---|---|---|
| Gregory Johnson | LAME75 | Prashant Lotwala | 2406 |
| Reporting Officer's Signature | Date | Supervisor's Signature | Date |
| | 08/29/2009 | | 8-31-2009 |

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**NATIONAL PARK SERVICE**
**LAKE MEAD NATIONAL RECREATION AREA**
**SUPPLEMENTAL INCIDENT RECORD**

FORM 10-343A

| Incident Number: LAME 09-2562 | TYPE: Boat Accident, Fatal |
|---|---|

and ignored it this year.  Ranger Stolts directed Michael to remove the plant from the soil and destroy it, which he did.

**EVIDENCE:**
See the following items attached:
- Boat Accident Report and attachments (bearing CIR# 09-2562)
- Preliminary coroner's report (bearing case number 09-06671)
- Custody Property Records, 3 (bearing CIR# 09-2562)
- Evidence Report, 1 – two pages (bearing CIR# 09-2562)
- Photo Log (bearing CIR# 09-2562)
- Written statement of Michael G. Browning
- Written statement of James Pettie

**INTERVIEWS:**
On August 20, 2009 at approximately 2338 hours Michael Browning was in the Echo Bay Ranger Station awaiting word on where **Juvenile** had been transported and stated substantially that: He wasn't sure how this had happened.  That he had been grilling on the bow of the boat and had gone back to the stern area and told **Juvenile** that dinner was about ready and it was time to get out of the water.  **Juvenile** had been swimming and playing on a raft that was tied to the houseboat with a rope.  Sometime before this, **Juvenile** had told Michael that the water coming out of the generator discharge felt warm on his feet.  Michael told **Juvenile** to stay away from that area.  He then went back to grilling, approximately five minutes after telling **Juvenile** that diner was about ready, James asked where **Juvenile** was.  Michael then called **Juvenile's** name several times without answer as he was searching both inside and outside the houseboat for **Juvenile**.  It was then that Michael looked over the aft starboard side of the rail and saw **Juvenile** floating face down in the water.  Michael immediately pulled him up on the deck and began CPR while James called 9-1-1 via the cell phone.


On August 22, 2009 between approximately 1050 and 1130 hours, Michael came to the Echo Bay Ranger Station and stated substantially the following (Ranger Stolts was also present for this interview): On August 20th, he and his family returned from the Echo Bay Marina between 1600 and 1700 hours to their houseboat.  At about which time the generator for the houseboat was turned on.  Shortly before approximately 2038 hours he was grilling on the bow of the vessel and his son **Juvenile** was near the starboard stern playing on a raft that was tied to the vessel at or just forward of the starboard stern gate.  He told **Juvenile** to get out of the water that it was about dinner time and **Juvenile** replied, "Okay daddy".

(While playing in that area at some point prior to being told it was time for dinner, **Juvenile** had stated to him that the water was warm on his (**Juvenile**) feet, to which Michael replied, to stay away from that area.)

| Reporting Officer's Name | ID # | Supervisor's Name | ID # |
|---|---|---|---|
| Gregory Johnson | LAME75 | Prashant Lotwala | 2406 |
| Reporting Officer's Signature | Date | Supervisor's Signature | Date |
|  | 08/29/2009 |  | 8-31-2009 |

# UNITED STATES DEPARTMENT OF THE INTERIOR
## NATIONAL PARK SERVICE
## LAKE MEAD NATIONAL RECREATION AREA
## SUPPLEMENTAL INCIDENT RECORD

FORM 10-343A

| Incident Number: LAME 09-2562 | TYPE: Boat Accident, Fatal |
|---|---|

Approximately five minutes later, James came up and asked him where **Juvenile** was, and he told him that **Juvenile** was on the raft; he then looked off the side and didn't see **Juvenile**. He then went through the cabin of the vessel to the stern and looked off both sides while calling for **Juvenile**. At this time, he looked over the edge of the railing where **Juvenile** had been playing on the starboard side and saw him floating face down in the water between the house boat and the raft, **Juvenile's** head pointing toward the bow of the boat. He immediately pulled **Juvenile** from the water and began CPR while James called 9-1-1.

While on the phone with 9-1-1 he told the dispatcher that he was north of Echo Bay, "Turn left and we're right there." While doing CPR and talking to 9-1-1 a helicopter flew over and continued too far north, he advised the dispatcher of this and told them they needed to come back south. He stated that he had a good connection with 9-1-1 until they saw the patrol boat enter the wrong cove, he set the phone down and when he picked it back up the line was dead.

**Juvenile** had been feeling congested for the past couple of nights so on the morning of the 20th he gave him a single caplet of day-quil at approximately 1000 hours. Described **Juvenile** as "strong athlete" and "excellent swimmer". He had no history of mental problems and his primary care physician was back in Montana.

We clarified with Michael who the diabetic supplies were for and he advised that they were James'. Additionally, we clarified who the tin foil, pen tube and marijuana grinder belonged to. He stated that they were likely James' and he didn't know that James had brought them on the boat. He further stated that James had a history of abusing his (James') prescription pain medication and had previously been in a detox program and had plans on returning to another program after the vacation.

Michael also took written statement forms home to complete on August 20th.

On August 24, 2009 between approximately 1500 and 1550 hours, Ranger Stolts and I met with Tina Browning, **Juvenile's** stepmother at her residence. She stated substantially that: at approximately 1800 hours on August 20th they returned to the houseboat from the Echo Bay Marina Store. At which time she began preparing dinner in the kitchen while **Juvenile** went swimming. While in the kitchen she heard **Juvenile** splashing around in the water and could tell that he was okay. Within approximately five to ten minutes after that, Michael had come through the cabin looking for **Juvenile**. She went to the stern of the vessel and saw Michael pull **Juvenile** out of the water. She assisted with CPR and talking to the 9-1-1 dispatcher. She also looked for flares but was unable to find any. She finally was able to find a "brand new" flashlight that they had brought and put batteries in it, and began to use it to signal the helicopter and patrol boat.

She further added that they had been doing CPR for about 2 – 2½ hours prior to help arriving. That, "If I only knew about the carbon monoxide I never would have rented the boat." They had rented the boat and left Echo Bay early Tuesday morning and planned on staying four days, and on Thursday took the speed boat

| Reporting Officer's Name | ID # | Supervisor's Name | ID # |
|---|---|---|---|
| Gregory Johnson | LAME75 | Prashant Lotwala | 2406 |
| Reporting Officer's Signature | Date | Supervisor's Signature | Date |
| | 08/29/2009 | | 8-31-2009 |

## UNITED STATES DEPARTMENT OF THE INTERIOR
### NATIONAL PARK SERVICE
### LAKE MEAD NATIONAL RECREATION AREA
### SUPPLEMENTAL INCIDENT RECORD

FORM 10-343A

| Incident Number: LAME 09-2562 | TYPE: Boat Accident, Fatal |
|---|---|

that they also rented and went into Echo Bay and asked to stay a fifth day. That **Juvenile**, "Swam like a fish," and earlier in the day while out on the speed boat had been swimming around the speed boat and was a, "Strong swimmer." **Juvenile** had been swimming all day and did not have his mask and snorkel on at this time because it, "Was starting to get dark."

They had the generator off for most of the day and had turned it on to cook dinner and it had been running for about thirty minutes to an hour – but was not sure.

She also clarified the drug paraphernalia including the tin foil, pen tube and marijuana grinder and said that it was James'. That James had been in a detox program but they were unable to afford keeping him there but had plans to get him into another more affordable program. That she was on several prescriptions including strong pain killers but often took less than the prescribed amounts.

Due to Tina's emotional state, she was not asked to complete a written statement.

On August 24, 2009 between approximately 1550 and 1630 hours Ranger Stolts and I spoke with James Pettie at his residence. He stated substantially the following: At approximately 1730 or 1800 he and the others arrived back at the houseboat from the Echo Bay Marina. **Juvenile** went to play in the water and wanted him to come play as well, instead he went to take a nap on the top bunk in the rear of the houseboat.

He awoke sometime later – approximately 1½ to 2½ hours later. During this time **Juvenile** had been swimming. He had been awake about 10-15 minutes when he got a cigarette and a coke and went to the area where **Juvenile** was playing and set the coke down. He then went up to where Michael was grilling. During the time that he was up where Michael was grilling, Michael told **Juvenile** it was time to get out, that dinner was almost ready. Not more than two to three minutes later, he got a towel and went to the stern of the houseboat to get **Juvenile** out of the water. At this time he couldn't find **Juvenile** and started yelling for him. He then hollered for Michael. It took Michael, "only a second to get to the back of the houseboat and find him." Michael then pulled **Juvenile** out of the water and he (James) grabbed his cell phone and called 9-1-1. He then handed the phone to Michael and started CPR on **Juvenile**. He was doing CPR at a rate of two breaths to thirty compressions.

He described **Juvenile** as a, "Good swimmer, he could probably swim better than I could."

He said that the generator was off most of the day. When they returned from the Echo Bay Marina, they turned the generator on and it had been running for three to four hours.
When questioned about the drug paraphernalia, he stated that it was his. Further, he described the tin foil and pen tube as being used to smoke his prescription pills. He used the exterior of the marijuana grinder to

| Reporting Officer's Name | ID # | Supervisor's Name | ID # |
|---|---|---|---|
| Gregory Johnson | LAME75 | Prashant Lotwala | 2406 |
| Reporting Officer's Signature | Date | Supervisor's Signature | Date |
| | 08/29/2009 | | 8-31-2009 |

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**NATIONAL PARK SERVICE**
**LAKE MEAD NATIONAL RECREATION AREA**
**SUPPLEMENTAL INCIDENT RECORD**

FORM 10-343A

time.  That he had been in rehab/detox for two weeks, getting out on July 14.

**Juvenile** also provided a written statement on notebook paper.

On August 24, 2009 at approximately 1630 hours, Ranger Stolts spoke with Michael Browning at his residence, he stated substantially that: during the orientation they only mentioned the CO detectors inside, not of CO poisoning outside.  They were told to read the warning signs.  As far as instruction on the generator, only showed how to start, stop and to run it six to eight hours a day.  That "Echo Bob" gave the orientation, and said him and his wife would run the generator all night for the AC.  The entire orientation took about forty minutes.

**DISPOSITION:**
Open: waiting for final coroner's report and Coast Guard Marine Investigator's report.

**CHARGES PENDING:**
None at this time.

| Reporting Officer's Name | ID # | Supervisor's Name | ID # |
|---|---|---|---|
| Gregory Johnson | LAME75 | Prashant Lotwala | 2406 |
| Reporting Officer's Signature | Date | Supervisor's Signature | Date |
| | 08/29/2009 | | 8-31-2009 |

**UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
LAKE MEAD NATIONAL RECREATION AREA
SUPPLEMENTAL INCIDENT RECORD**

FORM 10-343A

| Incident Number: LAME 09-2562 | TYPE: Boat Accident, Fatal |
|---|---|

Juvenile's Information:
MURPHY, Joshua; DOB: 04/25/1998; 608 Ash ST, Anaconda, MT  59711

**JUVENILE**

| Reporting Officer's Name | ID # | Supervisor's Name | ID # |
|---|---|---|---|
| Gregory Johnson | LAME75 | Prashant Lotwala | 2406 |
| Reporting Officer's Signature | Date | Supervisor's Signature | Date |
| | 08/29/2009 | | 8-31-2009 |



U.S. DEPARTMENT OF THE INTERIOR
# NATIONAL PARK SERVICE  JUVENILE

## BOAT ACCIDENT
## INVESTIGATION REPORT

| COAST GUARD CASE # | REPORTING AGENCY CASE # | INVEST. DATE |
|---|---|---|
| | LAME 09-2562 | 8/21/2009 |

| | |
|---|---|
| COMMERCIAL ☐ RECREATIONAL ☒ | PROPERTY DAMAGE OVER $200  YES ☐ NO ☒  FATALITY ☒ IF YES, NUMBER 1 <br> PROPERTY DAMAGE OVER $500  YES ☐ NO ☒  INJURIES BEYOND FIRST AID NO ☒ IF YES, NUMBER |

### ACCIDENT DATA

| DATE OF ACCIDENT  8/20/2009 | TIME (24 HOUR CLOCK) 2038 | NAME OF BODY OF WATER LAKE MEAD | LOCATION (GIVE LOCATION PRECISELY) N 36 17.9753, W 114 24.2664 |
|---|---|---|---|

| NUMBER OF VESSELS INVOLVED          1 | NEAREST CITY OR TOWN (STATE OF OCCURRENCE) OVERTON | COUNTY CLARK | STATE NV | ZIP 89040 |
|---|---|---|---|---|

| WEATHER (CIRCLE ALL APPLICABLE) | WATER CONDITIONS | TEMPERATURES | WIND | WARNING IN EFFECT |
|---|---|---|---|---|
| ☒ CLEAR    ☐ RAIN <br> ☐ CLOUDY   ☐ SNOW <br> ☐ FOG      ☐ HAZY | ☒ CALM (WAVES < 6") <br> ☐ CHOPPY (6"-2') <br> ☐ ROUGH (2'-6') <br> ☐ VERY ROUGH (>6') <br> ☐ STRONG CURRENT | AIR      ° F <br><br> WATER 89.00 ° F | ☒ NONE <br> DIRECTION <br> ☐ LIGHT (0-6 MPH) <br> ☐ MODERATE (7-14 MPH) <br> ☐ STRONG (15-25 MPH) <br> ☐ STORM (OVER 25 MPH) | ☒ NONE <br> ☐ SMALL CRAFT <br> ☐ GALE <br> ☐ STORM |

| TYPE OF BOAT | | HULL MATERIAL | | VISIBILITY |
|---|---|---|---|---|
| VESSEL #1  #2 <br> ☐ ☐ OPEN MOTOR BOAT <br> ☐ ☐ ROW BOAT <br> ☐ ☐ PERS. WATERCRAFT <br> ☐ ☐ AUXILLARY SAIL <br> ☒ ☐ HOUSEBOAT | VESSEL #1  #2 <br> ☐ ☐ CABIN MOTOR BOAT <br> ☐ ☐ SAIL (ONLY) <br> ☐ ☐ CANOE/KAYAK <br> ☐ ☐ PONTOON BOAT <br> ☐ ☐ OTHER (SECIFY) | VESSEL #1  #2 <br> ☐ ☐ WOOD <br> ☒ ☐ STEEL <br> ☐ ☐ RUBBER / VINYL / CANVAS | VESSEL #1  #2 <br> ☐ ☐ ALUMINUM <br> ☐ ☐ FIBERGLASS <br> ☐ ☐ RIGID HULL INFLAT. <br> ☐ ☐ OTHER (SPECIFY) | DAY    NIGHT <br> ☒ GOOD   ☐ <br> ☐ FAIR    ☐ <br> ☐ POOR   ☒ |

| ENGINE | FUEL | PROPULSION | | RENTED BOAT |
|---|---|---|---|---|
| VESSEL #1  #2 <br> ☒ ☐ OUTBOARD <br> ☐ ☐ INBOARD <br> ☐ ☐ INBOARD-STERNDRIVE (I/O) <br> ☐ ☐ AIRBOAT | VESSEL #1  #2 <br> ☒ ☐ GASOLINE <br> ☐ ☐ DIESEL <br> ☐ ☐ ELECTRIC | VESSEL #1  #2 <br> ☒ ☐ PROPELLER <br> ☐ ☐ AIR THRUST <br> ☐ ☐ SAIL | VESSEL #1  #2 <br> ☐ ☐ WATER JET <br> ☐ ☐ MANUAL | VESSEL #1 <br> ☒ YES ☐ NO <br><br> VESSEL #2 <br> ☐ YES ☐ NO |

| WHAT CONTRIBUTED TO ACCIDENT | | OPERATION AT TIME OF ACCIDENT |
|---|---|---|
| VESSEL #1  #2 <br> ☐ ☐ WEATHER <br> ☐ ☐ NO PROPER LOOKOUT <br> ☐ ☐ RESTRICTED VISION <br> ☐ ☐ IMPROPER LOADING <br> ☐ ☐ FAIL TO YEILD <br> ☐ ☐ OPERATOR INEXPERIENCE <br> ☐ ☐ OPERATOR INATTENTION <br> ☐ ☐ PASSENGER/SKIER BEHAVIOR <br> ☐ ☐ RECKLESS OPERATION | VESSEL #1  #2 <br> ☐ ☐ EXCESSIVE SPEED <br> ☐ ☐ NO SKIER LOOKOUT <br> ☐ ☐ OVERLOADING <br> ☐ ☐ HAZARDOUS WATERS <br> ☐ ☐ DRUG USE <br> ☐ ☐ ALCOHOL USE <br> ☐ ☐ EQUIPMENT FAILURE <br> ☐ ☐ NAV. LIGHTS IMPROPERLY MOUNTED, DISPLAYED, OR COLORED <br> ☐ ☐ CONGESTED WATERS <br> ☐ ☐ HULL FAILURE <br> ☒ ☐ OTHER:SWIMMER BEHAVIOR | VESSEL #1  #2 <br> ☐ CRUISING <br> ☐ CHANGING DIRECTION <br> ☐ CHANGING SPEED <br> ☐ DRIFTING <br> ☐ TOWING <br> ☐ BEING TOWED <br> ☐ ROWING / PADDLING <br> ☐ SAILING <br> ☐ LAUNCHING <br> ☐ DOCKING / UNDOCKING <br> ☐ AT ANCHOR <br> ☐ TIED TO DOCK / MOORED <br> ☒ OTHER: BEACHED |

| ACTIVITY AT TIME OF ACCIDENT | TYPE OF ACCIDENT | |
|---|---|---|
| VESSEL #1  #2 <br> ☐ ☐ FISHING <br> ☐ ☐ TOURNAMENT <br> ☐ ☐ HUNTING <br> ☒ ☐ SWIMMING / DIVING <br> ☐ ☐ MAKING REPAIRS <br> ☐ ☐ WATER SKIING / TUBING / ETC. <br> ☐ ☐ RACING <br> ☐ ☐ WHITEWATER SPORTS <br> ☐ ☐ FUELING <br> ☐ ☐ NON-RECREATIONAL <br> ☐ ☐ OTHER: | VESSEL #1  #2 <br> ☐ ☐ GROUNDING <br> ☐ ☐ CAPSIZING <br> ☐ ☐ FLOODING / SWAMPING <br> ☐ ☐ SINKING <br> ☐ ☐ FIRE EXPLOSION (FUEL) <br> ☐ ☐ SKIER MISHAP <br> ☐ ☐ COLLISION WITH VESSEL | VESSEL #1  #2 <br> ☐ ☐ COLLISION WITH FIXED OBJECT <br> ☐ ☐ COLLISION WITH FLOATING OBJECT <br> ☐ ☐ FALLS OVERBOARD <br> ☐ ☐ FALLS IN BOAT <br> ☐ ☐ STRUCK BY BOAT <br> ☐ ☐ STRUCK BY MOTOR / PROPELLER <br> ☐ ☐ HIT AND RUN <br> ☐ ☐ FIRE EXPLOSION (OTHER THAN FUEL) <br> ☒ ☐ OTHER: CARBON MONOXIDE POISONING |

### INJURED – IF SUBSTANTIAL BODILY HARM OR FATALITY, ATTACH ADDITIONAL FORMS

SUBSTANTIAL BODILY HARM MEANS:
1. BODILY INJURY WHICH CREATES A SUBSTANTIAL RISK OF DEATH OR WHICH CAUSES SERIOUS, PERMANENT DISFIGURMENT OR PROTACCTED LOSS OR IMPAIRMENT OF THE FUNCTION OF ANY BODILY MEMBER OR ORGAN; OR
2. PROLONGED PHYSICAL PAIN

| VESSEL # 1 – NAME OF OPERATOR | FRIST:  Michael | MI: G | OPERATOR ADDRESS |
|---|---|---|---|

**LAST:  BROWNING** — 6109 BREEDERS CUP ST — CITY LAS VEGAS — ST, NV ZIP CODE 89130

| MALE ☒ FEMALE ☐ | DOB (mm/dd/yyyy) 12/1/1959 | OPERATOR EXPERIENCE | FORMAL INSTRUCTION IN BOATING SAFETY |
|---|---|---|---|
| 5'8" HT 200 WT  BLU EYES  BLO HAIR | SOCIAL SECURITY NUMBER | ☐ UNDER 10 HOURS<br>☐ 10 TO 100 HOURS<br>☐ OVER 100 HOURS | ☐ STATE COURSE  ☐ U.S. POWER SQDN<br>☐ USCG AUX        ☐ AMERICAN RED CROSS<br>☐ INFORMAL      ☐ NONE<br>☐ OTHER: |
| OPERATOR TELEPHONE NUMBER (702) 395 - 7238 | DL LIC# 2600203261 ST.NV<br>DL. RESTRICTION? ☒ NO ☐ YES<br>IF YES, SPECIFY: | | |

| MEDICAL TREATMENT BEYOND FRIST AID? ☐ YES ☐ NO IF YES, DESCRIBE: | FATAL: ☐ YES ☒ NO |
|---|---|

| NUMBER OF PERSONS ON BOARD 4 | WAS PFD WORN?<br>☒ NO ☐ YES, TYPE | ESTIMATED SPEED |
|---|---|---|
| NUMBER OF PERSONS TOWED 0 | ☐ BEFORE<br>☐ AS A RESULT OF ACCIDENT | ☒ UNDER 10 MPH ☐ 10-20 MPH ☐ OVER 20 MPH ☐ OVER 40 MPH |

| BOAT REGISTRATION OR DOCUMENTATION NUMBER NV 3281 KF | STATE NV | HULL IDENTIFICATION NUMBER HLR01045E686 | BOAT NAME 224 |
|---|---|---|---|

| LENGTH 46' 9" | YEAR BUILT 1986 | BOAT MANUFACTURER MASTER FABRICATORS | MODEL HOUSEBOAT |
|---|---|---|---|

| NAME OF OWNER ECHO BAY RESORT | NUMBER OF ENGINES 2 | TOTAL HORSEPOWER 140 |
|---|---|---|

| OWNER ADDRESS STREETHC-30, BOX 30 CITYOVERTON                    ST, NV   ZIP CODE89040 | OWNER TELEPHONE NUMBER (702) 394 - 4000 |
|---|---|

**OTHER PERSONS ON BOARD ( IF MORE THAN 3 PERSONS, LIST AT TOP OF NARRATIVE**

| # 1 NAME Browning, Tina M.<br>MEDICAL TREATMENT BEYOND FRIST AID ☒ NO IF YES  DESCRIBE          FATAL ☐ YES ☒ NO | DOB: 1/24/1961<br>☐ M ☒ F | ADDRESS:6109 BREEDERS CUP ST<br>CITY Las Vegas  ST NV ZIP 89130<br>TELEPHONE # (702) 395 - 7238 | WAS PFD WORN? ☐ YES ☒ NO, TYPE<br>☐ BEFORE ☐ AS A RESULT OF ACCIDENT |
|---|---|---|---|
| # 2 NAME Pettie, James Dustin<br>MEDICAL TREATMENT BEYOND FRIST AID ☒ NO IF YES  DESCRIBE          FATAL ☐ YES ☒ NO | DOB: 2/24/1990<br>☒ M ☐ F | ADDRESS:6109 BREEDERS CUP ST<br>CITY Las Vegas  ST NV ZIP 89130<br>TELEPHONE # (702) 395 - 7238 | WAS PFD WORN? ☐ YES ☒ NO, TYPE<br>☐ BEFORE ☐ AS A RESULT OF ACCIDENT |
| # 3 NAME Murphy, Joshua<br>MEDICAL TREATMENT BEYOND FRIST AID ☐ NO IF YES  DESCRIBE          FATAL ☒ YES ☐ NO | DOB: 4/25/1986<br>☒ M ☐ F | ADDRESS:608 ASH ST<br>CITY Anaconda  ST MT ZIP 59711<br>TELEPHONE # (    ) | WAS PFD WORN? ☐ YES ☒ NO, TYPE<br>☐ BEFORE ☐ AS A RESULT OF ACCIDENT |

| VESSEL # 2 – NAME OF OPERATOR | FRIST | MI | OPERATOR ADDRESS |
|---|---|---|---|

**LAST** — CITY — ST,  ZIP CODE

| MALE ☐ FEMALE ☐ | DOB (mm/dd/yyyy) | OPERATOR EXPERIENCE | FORMAL INSTRUCTION IN BOATING SAFETY |
|---|---|---|---|
| HT  WT  EYES  HAIR | SOCIAL SECURITY NUMBER | ☐ UNDER 10 HOURS<br>☐ 10 TO 100 HOURS<br>☐ OVER 100 HOURS | ☐ STATE COURSE  ☐ U.S. POWER SQDN<br>☐ USCG AUX        ☐ AMERICAN RED CROSS<br>☐ INFORMAL      ☐ NONE<br>☐ OTHER: |
| OPERATOR TELEPHONE NUMBER (   )   - | DL LIC#          ST.<br>DL. RESTRICTION? ☐ NO ☐ YES<br>IF YES, SPECIFY: | | |

| MEDICAL TREATMENT BEYOND FRIST AID? ☐ YES ☐ NO IF YES, DESCRIBE: | FATAL: ☐ YES ☐ NO |
|---|---|

| NUMBER OF PERSONS ON BOARD | WAS PFD WORN?<br>☐ NO ☐ YES, TYPE | ESTIMATED SPEED |
|---|---|---|
| NUMBER OF PERSONS TOWED | ☐ BEFORE<br>☐ AS A RESULT OF ACCIDENT | ☐ UNDER 10 MPH ☐ 10-20 MPH ☐ OVER 20 MPH ☐ OVER 40 MPH |

| BOAT REGISTRATION OR DOCUMENTATION NUMBER | STATE | HULL IDENTIFICATION NUMBER | BOAT NAME |
|---|---|---|---|

| LENGTH | YEAR BUILT | BOAT MANUFACTURER | MODEL |
|---|---|---|---|

| NAME OF OWNER | NUMBER OF ENGINES | TOTAL HORSEPOWER |
|---|---|---|

| OWNER ADDRESS STREET CITY                              ST,    ZIP CODE | OWNER TELEPHONE NUMBER (   )   - |
|---|---|

**OTHER PERSONS ON BOARD ( IF MORE THAN 3 PERSONS, LIST AT TOP OF NARRATIVE**

| # 1 NAME<br>MEDICAL TREATMENT BEYOND FRIST AID ☐ NO IF YES  DESCRIBE          FATAL ☐ YES ☐ NO | DOB:<br>☐ M ☐ F | ADDRESS:<br>CITY  ST  ZIP<br>TELEPHONE # (    )   - | WAS PFD WORN? ☐ YES ☐ NO, TYPE<br>☐ BEFORE ☐ AS A RESULT OF ACCIDENT? |
|---|---|---|---|
| # 2 NAME<br>MEDICAL TREATMENT BEYOND FRIST AID ☐ NO IF YES  DESCRIBE          FATAL ☐ YES ☐ NO | DOB:<br>☐ M ☐ F | ADDRESS:<br>CITY  ST  ZIP<br>TELEPHONE # (    )   - | WAS PFD WORN? ☐ YES ☐ NO, TYPE<br>☐ BEFORE ☐ AS A RESULT OF ACCIDENT? |
| # 3 NAME<br>MEDICAL TREATMENT BEYOND FRIST AID ☐ NO IF YES  DESCRIBE          FATAL ☐ YES ☐ NO | DOB:<br>☐ M ☐ F | ADDRESS:<br>CITY  ST  ZIP<br>TELEPHONE # (    )   - | WAS PFD WORN? ☐ YES ☐ NO, TYPE<br>☐ BEFORE ☐ AS A RESULT OF ACCIDENT? |

| PERSONAL FLOATATION DEVICES | VESSEL # 1 | VESSEL # 2 | EQUIPMENT | VESSEL # 1 | VESSEL # 2 |
|---|---|---|---|---|---|
| WAS THE VESSEL ADEQUATELY EQUIPPED WITH COAST GUARD APPROVED FLOTATION DEVICES? | ☒ YES ☐ NO | ☐ YES ☐ NO | FIRE EXTINGUISHER ON BOARD? | ☒ YES ☐ NO | ☐ YES ☐ NO |
| WERE THEY ACCESSIBLE? | ☒ YES ☐ NO | ☐ YES ☐ NO | REQUIRED NUMBER(S)? | ☒ YES ☐ NO | ☐ YES ☐ NO |
| WERE THEY PROPERLY SIZED? | ☒ YES ☐ NO | ☐ YES ☐ NO | FIRE EXTINGUISHER USED? | ☐ YES ☒ NO | ☐ YES ☐ NO |
| WAS A THROWABLE USED? | ☐ YES ☒ NO | ☐ YES ☐ NO | FLAME ARRESTOR / CONTROL? | ☒ YES ☐ NO | ☐ YES ☐ NO |
| | | | SOUND PRODUCING DEVICE | ☒ YES ☐ NO | ☐ YES ☐ NO |

## WITNESSES NOT ON VESSEL(S)

| NAME LAST:          First: | ADDRESS CITY          ST    ZIP | TELE. # ( )          - |
|---|---|---|
| NAME LAST:          First: | ADDRESS CITY          ST    ZIP | TELE. # ( )          - |
| NAME LAST:          First: | ADDRESS CITY          ST    ZIP | TELE. # ( )          - |
| NAME LAST:          First: | ADDRESS CITY          ST    ZIP | TELE. # ( )          - |

## DRUG / ALCOHOL USE

| HOW LONG HAD OPERATOR BEEN ON THE WATER BEFORE THIS ACCIDENT OCCURRED?  VESSEL # 1          VESSEL # 2  3.5 days          n/a | WAS THERE ANY LIQUOR OR ALCOHOLIC BEVERAGE ON BOARD DURING OPERATION OF VESSEL? ☐ NO  ☒ YES, IF YES;  VESSEL # 1 AMOUNT AND TYPE: unknown  VESSEL # 2 AMOUNT AND TYPE: n/a |

| ALCOHOL / DRUG USE: | VESSEL # 1 | VESSEL # 2 | OPERATOR TEST RESULTS | | DID ANY OF THE PASSENGERS CONSUME ANY ALCOHOL? | |
|---|---|---|---|---|---|---|
| | | | VESSEL # 1 | VESSEL # 2 | VESSEL # 1 | VESSEL # 2 |
| ALCOHOL/DRUG USE APPARENT | ☒ YES ☐ NO | ☐ YES ☐ NO | BLOOD | | ☐ YES ☒ NO | ☐ YES ☐ NO |
| OUI ALCOHOL | ☐ YES ☒ NO | ☐ YES ☐ NO | BREATH | | | |
| OUI DRUGS | ☐ YES ☒ NO | ☐ YES ☐ NO | URINE | | | |
| OUI ALCOHOL / DRUGS | ☐ YES ☒ NO | ☐ YES ☐ NO | OTHER | | | |
| HAD BEEN DRININKING | ☒ YES ☐ NO | ☐ YES ☐ NO | NONE | | | |

| COULD THE ACTIONS OF THE PASSENGERS HAVE CONTRIBUTED TO THE ACCIDENT? ☐ NO  ☒ YES IF YES, DESCRIBE: See attached report. |

| VESSEL # 1 INSURANCE COMPANY: VESSEL # 2 INSURANCE COMPANY: | IMPOUNDED/ STORED:  IMPOUNDED/ STORED: |
|---|---|
| VIOLATIONS CHARGED: NAME:          VESSEL # | VIOLATION CODE(S): |
| NAME:          VESSEL # | VIOLATION CODE(S): |

| NAME OF OWNER OF DAMAGED PROPERTY OTHER THAN VESSELS  DESCRIBE OTHER PROPERTY: | DAMAGE EST. | ADDRESS:  CITY          ST    ZIP |
|---|---|---|

| DAMAGE BOAT #1, DAMAGE ESTIMATE  INITIAL IMPACT POINT #: MARK OR CIRCLE NUMBERS OF ALL OTHER DAMAGED AREAS | | DAMAGE BOAT #2, DAMAGE ESTIMATE  INITIAL IMPACT POINT #: MARK OR CIRCLE NUMBERS OF ALL OTHER DAMAGED AREAS |
|---|---|---|

#1   #2
☐ 13 - BELOW WATER LINE  ☐
☐ 14 - LOWER UNIT  ☐
☐ 15 - WINDSHIELD  ☐
☐ 16 - BURNED  ☐
☐ 17 - SUNK  ☐
☐ 18 - INJURIES  ☐
☒ 19 - NO DAMAGE  ☐

INDICATE POSITION IN VESSEL FOR OPERATOR (O), PASSENGER #, SEATED (S) STAND (A), AND OTHER (N)

POST ACC RELATION TO BOAT
R-REMAINS ABORD
F- FALL
E- EJECTED OVERBOARD
L-LEAVES BOAT VOLUNTARILY
T-TRAPPED IN OVERTURNED BOAT

EXAMPLES
OAR – OPERATOR STAND REMAINS ABOARD
2SF-PASSENGER #2 SEATED FALL OVERBOARD

DESCRIBE DAMAGE:          DESCRIBE DAMAGE:

DIAGRAM BELOW THE POSITION AND DIRECTION OF TRAVEL OF BOTH BOAT(S) INVOLVED

BEFORE          AT          AND AFTER IMPACT          *NOT TO SCALE*          N



V1 = Houseboat
     (NV32B1 KF)
V2 = Rented Speed
     Boat
G = Generator
E = Engines
R = Raft

LAND   BOW   V1   BOW   V2   G   E   A R R

## NARRATIVE
### BRIEFLY DESCRIBE SEQUENCE OF EVENTS

On August 20, 2009 at approximately 2040 hours I was off duty and contacted at my residence to respond to a reported drowning of an eleven year old that fell off a boat, CPR in progress at Echo Bay Marina slip 224. After arrival at approximately 2046 hours Ranger Dollinger and I found that there was no slip 224 at Echo Bay. Further investigation revealed that it was actually Echo Bay houseboat 224 which was rented and out on the water.

At approximately 2231 hours Ranger Martin and I along with a medical team from Rescue 74 arrived on scene at the location listed above. Upon our arrival the family was doing CPR on the eleven year old on the aft deck of the houseboat. The eleven year old was airlifted from the scene by Metro SAR Air 6 to the Echo Bay Launch Ramp. He was then transferred to Mercy Air 11 and transported to UMC Trauma.

Investigation later revealed that the eleven year old was floating on a raft tied the houseboat for sometime near the aft starboard area of the houseboat. The family states that they had last seen the eleven year old playing 3-5 minutes before he was pulled from the water face down not breathing. The generator for the house boat was running during this time, which was located in the aft starboard corner of the vessel.

A preliminary report from the Clark County Coroner's Office indicated that carbon monoxide poisoning was the primary cause of death, with drowning secondary.

| DATE REPORT FORWARD TO: U.S. COST GUARD MSO | STATE REPORTING AUTHORITY | USNPS/LMNRA | OTHER (AGENCY) |
|---|---|---|---|

U.S. COAST GUARD STANDARDS BRANCH NOTIFIED FOR POSSIBLE CONCIDERATION OF DEFECT NOTIFICATION ☒ NO ☐ YES, DATE

| REPORTING OFFICER'S NAME (PRINT)<br>Gregory Johnson | PHONE #<br>(702)293 - 8998 EXT. | AGENCY<br>US NPS, LAKE MEAD NRA | DATE<br>09/09/2009 |
|---|---|---|---|
| REPORTING OFFICER'S SIGNATURE | | AGENCY ADDRESS<br>601 BOULDER HWY BOULDER CITY, NV 89005. | |
| APPROVED BY (PRINT)<br>Prashant Lotwala | SIGNATURE | | DATE<br>9-15-2009 |

### (DO NOT USE) FOR STATE REPORTING AUTHOURITY REVIEW

| CAUSES BASED ON (CHECK ONE)<br>☐ THIS REPORT    ☐ INVESTIGATION AND THIS REPORT<br>☐ INVESTIGATION    ☐ COULD NOT BE DETERMINED | SIGNATURE OF REVIEWING OFFICER | DATE |
|---|---|---|
| PRIMARY CAUSE OF ACCIDENT | SECONDARY CAUSE ACCIDENT | |

BOAT ACCIDENT
INVESTIGATION FATALITY REPORT **JUVENILE**

(COMPLETE ONE FORM FOR EACH PERSON DECEASED)

| NAME: (Last, First Middle) Murphy, Joshua | ADDRESS: 608 Ash ST Anaconda, MT 59711 | OCCUPATION: Student |
|---|---|---|

| RACE: Caucasian | SOCIAL SECURITY NUMBER: | DOB: 04/25/98  SEX: (M) F | VESSEL NUMBER: | VICTIM'S SWIMMING ABILITY: ___ 0 - UNKNOWN  _X_ 1 - SWIMMER  ___ 2 - NON-SWIMMER |
|---|---|---|---|---|

PHYSICAL CONDITION:
1. BLACKOUT/EPILEPSY/SEIZURE
2. EYESIGHT/DEFECT
3. FATIGUE/ASLEEP
4. HEARING
5. SICK/ILL        **6** (NUMBER)
6. NONE KNOWN
7. UNDER THE INFLUENCE OF
   ALCOHOL/DRUGS BAC: ____
8. OTHER (explain)

ACTIVITY AT TIME OF DEATH:
1. OPERATOR    10. OTHER (EXPLAIN)
2. PASSENGER
3. SKIING
4. SWIMMING        **4** (NUMBER)
5. SCUBA DIVING
6. SNORKELING
7. FISHING
8. HUNTING
9. WITNESS/BYSTANDER

VICTIM'S DRESS:
_X_ 0 - BATHING SUIT
___ 1 - LIGHT CLOTHING
___ 2 - HEAVY CLOTHING
___ 3 - OTHER

WAS VICTIM WEARING A P.F.D.? YES ___ NO _X_

WAS VICTIM WEARING A P.F.D. WHEN RECOVERED?
YES ___ NO _X_ IF YES, LIST TYPE:

DEATH CAUSED BY:
___ 0 - UNK. ___ 1 - DROWNING
___ 2 - DISAPPEAR ___ 3 - IMPACT ___ 4 - INJURY

AUTOPSY? _X_ YES NO ___

ADMINISTERED BY:

TYPE ADMINISTERED:

STATUS CODES: (circle one)
1. DNA/UNKNOWN          5. TREATED AND RELEASED
2. FIRST AID ONLY       6. ADMITTED TO HOSPITAL
3. MEDICAL TREATMENT    7. REFUSED TREATMENT
   BEYOND FIRST AID
4. INCAPACITATED OVER 24 HOURS

TAKEN TO: University Medical Center, Las Vegas, NV

BY: Mercy Air 11

**PERSONAL PROPERTY**

RELEASED TO:

| RELATION: n/a | DATE: | TIME: AM/PM | BY: |
|---|---|---|---|

BODY RECOVERY:

LOCATION: N36° 17.9753, W114° 24.2664   DISTANCE FROM ACCIDENT: Same location
DISTANCE FROM SHORE: 12 ft          WATER DEPTH: 8 ft
DISCOVERED BY: (LIST NAME, ADDRESS, CITY, ST, ZIP): Browning, Michael G.  6109 Breeders Cup ST  Las Vegas, NV  89130
BODY RECOVERED BY: (LIST NAME, ADDRESS, CITY, ST, ZIP): SAME
BODY RECOVERED: DATE: 08/20/09 TIME: 2038   CONDITION OF BODY:

NEXT OF KIN:

NAME: Jodie Murphy          ADDRESS: 608 Ash ST   CITY/STATE/ZIP: Anaconda, MT 59711
RELATIONSHIP: Mother        NOTIFIED? _X_ YES ___ NO  BY WHOM: Michael Browning

TITLE: father          WHEN (TIME/DATE):

PRONOUNCED DEAD BY: Dr. Burnette (Univ. Medical Center)   VICTIM'S BLOOD/ALCOHOL CONTENT: n/a
FUNERAL HOME: Desert Desert Memorial Cremation & Burial   CONTROLLED SUBSTANCE: n/a

| REPORTING OFFICER(S) Gregory Johnson | DATE SIGNED: 08/27/09 | REVIEWING SUPERVISOR: | DATE REVIEWED: 8-31-2009 |
|---|---|---|---|

U.S. DEPARTMENT OF THE INTERIOR
**NATIONAL PARK SERVICE**

CASE NO: LAME
09-2562

**V E S S E L**

**Type:** ☐ INJURED ☒ FATALITY ☐ MISSING (BODY NOT LOCATED)

**TREATMENT:**
☐ TREATMENT BEYOND FIRST AID
☒ TRANSPORTED TO HOSPITAL
☐ REFUSED TREATMENT

**Victim Information:** ☐ OPERATOR ☒ SWIMMER ☐ ON SHORE/DOCK ☐ OCCUPANT ☐ SKIER ☒ MALE ☐ FEMALE

| LAST MURPHY | FIRST JOSHUA | MI | DOB 04/25/98 |
|---|---|---|---|

| STREET 608 Ash ST | | WORK PHONE ( ) |
|---|---|---|

| CITY Anaconda | STATE MT | ZIP 59711 | WORK PHONE ( ) |
|---|---|---|---|

**I**

**INJURY CAUSED BY:**
☐ IMPACT WITH BOAT
☐ IMPACT WITH WATER
☐ IMPACT WITH FIXED OBJECT
☐ IMPACT WITH FLOATING OBJECT
☐ STRUCK BY BOAT
☐ PROPELLER OR SKAG
☒ OTHER Carbon Monoxide

**DEATH CAUSED BY:**
☐ DROWNING
☐ HYPOTHERMIA
☐ TRAUMA
☒ OTHER: Carbon Monoxide
☐ ALCOHOL INVOLVED
[___] BAC

**PRIMARY/SECONDARY INJURY:**
| ☐ | ☐ AMPUTATION |
| ☐ | ☐ BACK INJURY |
| ☐ | ☐ BROKEN BONE(S) |
| ☐ | ☐ BURNS |
| ☐ | ☐ CONTUSIONS |
| ☐ | ☐ DISLOCATIONS |
| ☐ | ☐ HEAD INJURY |
| ☐ | ☐ HYPOTHERMIA |
| ☐ | ☐ INTERNAL INJURIES |
| ☐ | ☐ LACERATION |
| ☐ | ☐ NECK INJURY |
| ☐ | ☐ SHOCK |
| ☐ | ☐ SPINAL INJURY |
| ☐ | ☐ SPRAIN/STRAIN |
| ☐ | ☐ TEETH/JAW |

**PFD USE:**
☐ TYPE I   ☐ TYPE III   ☐ TYPE V
☐ TYPE II  ☐ TYPE IV   ☐ INFLATABLE
☐ USCG APPROVED
USCG APPROVAL #: _____

**PHYSICAL CONDITION**
☐ UNKNOWN
☒ NORMAL   ☐ UNDER INFL. OF ALCOHOL/DRUGS
☐ OTHER _____

**VICTIM ACTIVITY:**
☐ FISHING
☐ HUNTING
☐ CRUISING
☒ SWIMMING
☐ WATERSKIING
☐ OTHER: _____

**LOCATION OF INJURY**

**FATAL SYNOPSIS**
See Attached

**V E S S E L**

**Type:** ☐ INJURED ☐ FATALITY ☐ MISSING (BODY NOT LOCATED)

**TREATMENT:**
☐ TREATMENT BEYOND FIRST AID
☐ TRANSPORTED TO HOSPITAL
☐ REFUSED TREATMENT

**Victim Information:** ☐ OPERATOR ☐ SWIMMER ☐ ON SHORE/DOCK ☐ MALE ☐ FEMALE

JUVENILE

| LAST | FIRST | DOB / / |
|---|---|---|

| STREET | | WORK PHONE ( ) |
|---|---|---|

| CITY | STATE | ZIP | WORK PHONE ( ) |
|---|---|---|---|

**INJURY CAUSED BY:**
☐ IMPACT WITH BOAT
☐ IMPACT WITH WATER
☐ IMPACT WITH FIXED OBJECT
☐ IMPACT WITH FLOATING OBJECT
☐ STRUCK BY BOAT
☐ PROPELLER OR SKAG
☐ OTHER _____

**DEATH CAUSED BY:**
☐ DROWNING
☐ HYPOTHERMIA
☐ TRAUMA
☐ OTHER: _____
☐ ALCOHOL INVOLVED
[___] BAC

**PRIMARY/SECONDARY INJURY:**
| ☐ | ☐ AMPUTATION |
| ☐ | ☐ BACK INJURY |
| ☐ | ☐ BROKEN BONE(S) |
| ☐ | ☐ BURNS |
| ☐ | ☐ CONTUSIONS |
| ☐ | ☐ DISLOCATIONS |
| ☐ | ☐ HEAD INJURY |
| ☐ | ☐ HYPOTHERMIA |
| ☐ | ☐ INTERNAL INJURIES |
| ☐ | ☐ LACERATION |
| ☐ | ☐ NECK INJURY |
| ☐ | ☐ SHOCK |
| ☐ | ☐ SPINAL INJURY |
| ☐ | ☐ SPRAIN/STRAIN |
| ☐ | ☐ TEETH/JAW |

**PFD USE:**
☐ TYPE I   ☐ TYPE III   ☐ TYPE V
☐ TYPE II  ☐ TYPE IV   ☐ INFLATABLE
☐ USCG APPROVED
USCG APPROVAL #: _____

**PHYSICAL CONDITION**
☐ UNKNOWN
☐ NORMAL   ☐ UNDER INFL. OF ALCOHOL/DRUGS
☐ OTHER _____

**VICTIM ACTIVITY:**
☐ FISHING
☐ HUNTING
☐ CRUISING
☐ SWIMMING
☐ WATERSKIING
☐ OTHER: _____

**LOCATION OF INJURY**

**FATAL SYNOPSIS**

# EXHIBIT 4

**ENGINEER'S REPORT**

**of the**

**JOSHUA MURPHY INCIDENT**

By

Arthur W. Faherty

February 26, 2010

File No. 09FE0363

# Robson Forensic

**Engineers, Architects, Scientists & Fire Investigators**

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000075

## JOSHUA MURPHY INCIDENT

**ENGINEER'S REPORT**                                     **26 February 2010**

### 1.0   INTRODUCTION

Joshua Murphy was an 11 year old boy, on vacation with his family at Lake Mead in Echo Bay, Nevada. The family had rented a houseboat from Seven Crown Resorts. On 20 August 2009, the family brought the houseboat into Pump House Cove on the beach, secured the two outboard engines and was preparing dinner with the houseboat generator running. Joshua was on board a raft alongside the houseboat when he was overcome with carbon monoxide and died.

The purpose of my investigation is to determine whether the actions/inactions of Seven Crown Resorts were a cause of Joshua's fatal injury.

### 2.0   AVAILABLE INFORMATION

- Clark County Corner Autopsy Report, August 21, 2009 of Joshua Murphy
- Site visit, 31 August 2009

### 3.0   EQUIPMENT

I photographed, measured and inspected the incident houseboat on 31 August 2009. The generator engine on the incident houseboat is a Westerbeke, Serial Number JL-1614-E802, 4 cylinder, 4 stroke gasoline engine. The engine nameplate data has the following information:

- Date of manufacture  February 2008
- Family Name  8  X 7  X SI  502AA
- Displacement  1468
- Emissions Control System EM TWC
- Emissions Compliance Period  Category B

The engine has an uplift, or waterlift, exhaust system where the exhaust is cooled by raw water and exhausted above the waterline on the starboard (right) side aft, approximately 12" off the water.

On the houseboat there is a danger sign located amidship, just forward of the 2 outboard engines, facing forward that states "Danger Carbon Monoxide/Exhaust is located Rear of Boat when Generator is operating.  Caution when swimming in this area."

There is a small sign outboard, starboard side, aft and above the exhaust pipe that states "Danger Carbon Monoxide Exhaust Fumes."



**Robson Forensic**

Engineers, Architects, Scientists & Fire Investigators

1

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000076

## 4.0   ANALYSIS

The Clark County Coroner's Autopsy Report puts the cause of death of 11 year old Joshua Murphy "as a result of carbon monoxide poisoning." According to the coroner's report the circumstance of death is:

> On 08/20/09 at approximately 2020 hours the decedent was floating on a raft next to the houseboat near the running generator on the back of the boat in Pump House Cove at Lake Mead. His father was cooking dinner and yelled out to the decedent to tell him that dinner would be ready in a few minutes. The father turned around and when he looked back he did not see the decedent. The father and other family members looked inside the houseboat for the decedent but could not locate him. Approximately 5 minutes later the father saw the decedent in the water next to the boat face down.

Seven Crown Resorts operates the marina/resort at Echo Bay on Lake Mead in the Lake Mead National Recreation Area (National Park) where the Murphy family had rented the incident houseboat. Seven Crown Resorts also has locations on Lake Mohave, Lake Shasta and in the California Delta. According to its website, "Seven Crown Resorts is one of the largest houseboat vacation companies in the U.S. and we're committed to giving you the best facilities and the most attractive rates anywhere." The Murphy family was using the houseboat as it was intended.

Joshua was fatally injured when he was unnecessarily and unreasonably exposed to the hazard of carbon monoxide. The combination of hazard and exposure created unreasonably dangerous conditions for Joshua which caused the fatal injury.

Carbon monoxide (CO) poisoning is a well known and documented issue on recreational houseboats. From the National Institute for Occupational Safety and Health website[1] the following excerpt describes the depth and breadth of the problem:

> In August 2000, the National Park Service, through the Department of the Interior, requested assistance from the National Institute for Occupational Safety and Health (NIOSH) and the US Coast Guard to evaluate visitor and employee carbon monoxide (CO) exposures from generators and propulsion engines on houseboats. This initial investigation characterized CO poisonings through epidemiologic data gathering and the measurement of severely hazardous CO concentrations on houseboats at Lake Powell. Since that initial investigation, over 600 boating-related poisonings in 35 states have been identified with over 100 of these poisonings resulting in death. Over 250 of the poisonings occurred on houseboats, with more than 200 of these poisonings attributed to generator exhaust alone.
>
> Initial investigations conducted by NIOSH industrial hygienists and engineers showed very high concentrations of CO on and around houseboats using gasoline-powered generators. Following these investigations, NIOSH worked with major houseboat and generator manufacturers to evaluate novel engineering controls to reduce CO concentrations in occupied areas on houseboats. This work led to collaborations with external partners to evaluate new engineering technologies designed to reduce CO poisonings on many other types of recreational boats (including ski boats and express cruisers). Since the start of this project, new catalyst-based low CO emission generators and stern-drive engines have been developed by manufacturers to help address this issue. This work has been conducted since 2002 under a continuing Interagency agreement with the U.S. Coast Guard.

---

[1] http://www.cdc.gov/niosh/topics/coboating/#b

## Robson Forensic

Engineers, Architects, Scientists & Fire Investigators

2

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000077

Carbon monoxide is developed when there is incomplete burning during the combustion process in an engine. As perfect combustion rarely occurs, CO is commonly present in the exhaust from gasoline engines, such as the generator used in the incident houseboat. CO is neutrally buoyant in air and dangerous concentrations can build up very quickly. The NIOSH recommended immediately dangerous to life and health concentration (IDLH) for CO is 1200 parts per million (ppm).

The Houseboat Industry Association website (www.houseboatindustry.org) has direct links to the National Institute for Occupational Safety and Health (NIOSH) website through the Standards and Regulations tab. At the NIOSH site there are more than ten listed engineering reports on houseboat/carbon monoxide/exhaust stacks that all center on the issue of carbon monoxide. The earliest of these reports on houseboats, from September 2000, is titled An Evaluation of Catalytic Emission Controls and Vertical Exhaust Stacks to Prevent Carbon Monoxide Poisonings from Houseboat Generator Exhausts. NIOSH has an additional six engineering reports, listed under Health Hazard Evaluations on the same website, that deal specifically with exhaust stacks or CO. One of these studies from April 2001 done on Lake Mead at Echo Bay, eight years before Joshua Murphy's death, is titled Evaluation of Houseboat Generator Exhaust at Lake Mead. This report is addressed to Mr. Bob Clark, Vice President, Seven Crown Resorts, 322 Lakeshore Road, Boulder City, Nevada.

In the April 2001 report, the tested generator on the Summit Ship Houseboat (Westerbeke 8.5 kW 4 cylinder 1.0 liter) exhausted over the starboard side of the houseboat, in the same location as the incident houseboat. A condensed table of the readings is included for the part of the test that only had generators, not propulsion (outboard) engines, operating. This test was done on 25 January 2001. It is significant to note the CO reading when the wind speed (in Feet Per Minute-fpm) is very slow; the CO level is deadly (The NIOSH recommended IDLH for CO is 1200 ppm.)

|  | Windspeed | Reading # 1 | Reading # 2 | Average Reading |
|---|---|---|---|---|
| Summit Ship Houseboat | 0-13 FPM | 1400 ppm | 4200 ppm | 3300 ppm |

**Seven Crown Resorts knew about the health hazards of CO poisonings from generators on houseboats.**

The incident houseboat, Nevada registration Number NV3281KF, was built by Master Fabricators in 1980. While there is no documentation presented when the generator was changed out, the generator engine nameplate indicates a date of manufacture of February 2008.

The generator present at the time of the incident is not the original generator but a replacement installed sometime after February 2008. Sometime in 2006/2007 Seven Crown Resorts made a decision to replace the older generator. Part of this decision making process was to determine to either use a:



**Robson Forensic**

Engineers, Architects, Scientists & Fire Investigators

3

1. Standard generator engine with uplift exhaust system (as was fitted on the incident houseboat),

2. A Safe-CO$^{TM}$ generator, or equivalent, or

3. Install either a standard generator or a Safe-CO$^{TM}$ *and* a vertical stack that exhausts the gases above and away from the inhabitants.

The first option is the decision that Seven Crown Resorts made notwithstanding overwhelming data that both Option 2 and Option 3 are safer than Option 1.

The second option -reducing the amount of CO generated- is viable but has some shortcomings. Once purchased, the engine needs to be properly maintained, including changing out of oxygen sensors and tested to verify performance. A second issue is that a failure of the control system could result in a dangerous situation without notice. Westerbeke Safe-CO$^{TM}$ engines, for example, were tested after running for 1 season and they performed very well. (An Evaluation of Catalytic Emission Controls to Prevent Carbon Monoxide Poisonings from Houseboat Generator Exhaust, Callville Bay Marina, Bolder City Nevada EPHB No. 171-38a) However, prior to testing, a damaged oxygen sensor needed to be replaced. The final sentence of the 4th recommendation, from this report is "The vertical exhaust stack should be retrofitted to existing and older generators as well as onto the new Safe-CO$^{TM}$ generators for system redundancy."

The third option -vertical exhaust stacks regardless of the engine- is less sensitive to failure. NIOSH studies as early as 2001, on Lake Powell and Somerset, Kentucky demonstrated that exhaust stacks extending 9' above the upper deck of a houseboat "dramatically reduced the CO concentrations on and near the houseboat and provided a much safer environment." (Pg 2 An Evaluation of Catalytic Emission Controls and Vertical Exhaust stacks to Prevent Carbon Monoxide Poisonings from Houseboat Generator Exhaust, September 2005, Report EPHB 171-36a) As previously noted, CO is neutrally buoyant in air. If the exhaust stack terminates 9' above the highest occupied deck, the chance of poisoning where people using houseboats may congregate are minimal.

The first two recommendations of this 2005(EPHB 171-36a) study by NIOSH are telling:

1. All manufacturers/owners/users of U.S. houseboats with gasoline-powered generators should be aware of and concerned about location of the exhaust terminus. Based on data from numerous NIOSH field surveys, we recommend that houseboats with gasoline-powered generators be evaluated for potential CO exposures and poisonings, and retrofitted with control systems to reduce the potential hazard of CO poisoning.

2. The vertical exhaust stack on the Fun Country Marine houseboats performed well during the current study. Based on the results of this and previous NIOSH evaluations of the vertical exhaust stack, NIOSH research indicates that when properly designed and installed, the vertical stack is a viable, low-cost, engineering control that will dramatically improve the safety of houseboat users.

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

4

September 2005.

A read through First Time Houseboater Tips on the Seven Crown Resorts website reveals three items:

- Seven crown Resorts is not expecting expert operators for the houseboat
    o "if you can drive a car, you can operate a houseboat"

- Swimming is large part of the houseboat experience
    o "Bring two, or three, bathing suits"

- More than likely, kids are going to be part of the picture
    o "especially if you are traveling with youngsters"

In another study conducted by NIOSH, Comparison of a Drystack with Existing Generator Exhaust Systems for Prevention of Carbon Monoxide Poisonings on Houseboats (EPHB 171-28a) dated August 2001, the study "confirmed the results of the previous study-average CO concentrations on the swim platform were approximately 1 ppm with the generator operating and exhausting through the drystack." Further, on page 21 it is "extremely important to direct the exhaust away from water or other areas where people may be located. At these levels, individuals swimming in the area around the exhaust, or around the area on or directly behind the swim platform (near the water) could quickly experience CO poisoning or death."

At the time of the August 2001 report (page 11) Fun Country Marine estimated the cost of a drystack exhaust system would be between $500 to $1000, if the work was done out of the water, and between $1000 and $1500 if the work was done while the boat was in the water.

There is a long held hierarchal standard, in industry of Design, Guard, Warn to address problems that exist. It is the duty of the engineer to first design out the problem. If that is not feasible, the second layer is to guard or protect the party from the problem. The least effective method is to warn of the problem is the design is not feasible and the guarding would prevent the practical use of the item. In the case of the generator exhaust the simple, cost effective design is to include a vertical stack to exit the exhaust away from people using the houseboat. When the boat was originally built, 1980, the problem of the CO may not have been known. By 2001 the problem was well known to Seven Crown Resorts. When Seven Crown Resorts decided to re-power the generator, it was a simple fix to design the CO problem out of the houseboat.

**Seven Crown Resorts knew, or should have known, that a vertical stack arrangement on a houseboat generator was a viable, low cost, dramatically safer approach to generator exhaust systems, with regards to CO poisoning, than a standard uplift exhaust system discharging over the side.**

**The actions/inactions of Seven Crown Resorts were a cause in the death of Joshua Murphy.**



**Robson Forensic**

Engineers, Architects, Scientists & Fire Investigators

5

## 5.0 FINDINGS

Within the bounds of reasonable engineering and technical certainty, and subject to change if additional information becomes available, it is my opinion that:

5.1 Seven Crown Resorts knew about the health hazards of CO poisonings from generators on houseboats.

5.2 Seven Crown Resorts knew, or should have known, that a vertical stack arrangement on a houseboat generator was a viable, low cost, dramatically safer approach to generator exhaust systems, with regards to CO poisoning, than a standard uplift exhaust system discharging over the side.

5.3 The actions/inactions of Seven Crown Resorts were a cause in the death of Joshua Murphy.

*Arthur W. Faherty*

Arthur W. Faherty (electronically signed)

**Robson Forensic**

Engineers, Architects, Scientists & Fire Investigators

6

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000081

# EXHIBIT 5

LETT

**FILED**

Mar 10  12 51 PM '10

CLERK OF THE COURT

DISTRICT COURT
CLARK COUNTY, NEVADA

In the Matter of the Estate of      )    Case No. P-10-067531
          )    Dept.    H
    JOSHUA MURPHY,      )
          )
        Deceased.      )
          )
          )

## LETTERS OF SPECIAL ADMINISTRATION

On the 29th day of January, 2010, the Court entered an Order appointing MARY JOLYNN MURPHY a/k/a MARY JOLYNN MURPHY-MILLER a/k/a JODI MURPHY a/k/a JODI MURPHY-MILLER a/k/a MJ MURPHY-MILLER and states that she is the same person as MARY JOLYNN-MURPHY-MILLER, as Special Administrator of the Decedent's Estate. The Order includes:

☒ A directive for no bond;

☐ A directive for the establishment of blocked accounts;

☐ A directive for the posting of bond in the sum of $_____; or

☐ A directive for both the establishment of blocked accounts for sums in excess of $_____ and the posting of bond in the sum of $_____.

The Special Administrator, having duly qualified, may act and has the authority and duties of Special Administrator.

In testimony of which, I have this date signed these Letters and affixed the seal of the Court.

CLERK OF THE COURT

RAE ROCK
Deputy Clerk              MAR 1 0 2010
                              Date

DISTRICT COURT SEAL

- 1 -

Joshua Murphy (deceased) 16.1 Production
000109

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000048

**OATH**

I MARY JOLYNN MURPHY a/k/a MARY JOLYNN MURPHY-MILLER a/ka/ MARY JOLYNN

MURPHY-MILLER a/k/a JODI MURPHY a/k/a JODI MURPHY-MILLER a/k/a MJ MURPHY-MILLER and

known forthwith as MARY JOLYNN MURPHY-MILLER,  whose mailing address is 455 Lawndale Drive, Spring

Creek, Nevada, 89815 solemnly affirm that I will faithfully perform according to law the duties of Special

Administrator and that all matters stated in any petition or paper filed with the Court by me are true of my

own knowledge or, if any matters are stated on information and belief, I believe them to be true.

ADMINISTRATOR

SUBSCRIBED AND AFFIRMED before me this
____ day of March, 2010.

CLERK OF COURT
By: _____ **RAE ROHUS**
Deputy Clerk
(OR) _____
NOTARY PUBLIC
County of _____ State of _____

- 2 -

Joshua Murphy (deceased) 16.1 Production
000110

Joshua Murphy (deceased)
Plaintiffs' 16.1 Production
000049

# EXHIBIT 6

1 | COMP
SAM HARDING LAW FIRM
2 | SAM HARDING, ESQ., #1877
1100 East Bridger Avenue
3 | Las Vegas, NV 89101
702-333-7777
4 | Attorney for MARY JOLYNN MURPHY
MARY JOLYNN MURPHY as Special
5 | Administrator of the ESTATE OF JOSHUA MURPHY

6 | PATRICK J. MURPHY, ESQ. #1222
1100 East Bridger Avenue
7 | Las Vegas, NV 89101
702-259-4600
8 | Attorney for MICHAEL BROWNING

Electronically Filed
03/18/2010 08:58:17 AM

Steven D. Grunn

CLERK OF THE COURT

9

10

11

DISTRICT COURT

CLARK COUNTY, NEVADA

A - 1 0 - 6 1 2 2 1 0 - c

12 | MARY JOLYNN MURPHY and
MICHAEL BROWNING, individually
13 | and as the natural parents of JOSHUA
MURPHY, deceased, and MARY
14 | JOLYNN MURPHY, as Special
Administrator of the ESTATE OF JOSHUA
15 | MURPHY, deceased,

16 | Plaintiffs,

17 | vs

18 | SEVEN RESORTS, INC., a Nevada
corporation, d/b/a SEVEN CROWN RESORTS
19 | and DOES 1 through 100 and ROE
CORPORATIONS 1 through 100, inclusive,

20

21 | Defendants.

) CASE NO. 10-A _____
)
) DEPT.     _____ X I I I _____
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

22

COMPLAINT

23

COME NOW PLAINTIFFS, MARY JOLYNN MURPHY (hereinafter referred to as

24

"JOLYNN MURPHY"), individually and as the natural parents of JOSHUA MURPHY,

25

deceased, and MARY JOLYNN MURPHY as Special Administrator of the Estate of JOSHUA

26

MURPHY, deceased, by and through their counsel of record, SAM HARDING, ESQ., of the

27

SAM HARDING LAW FIRM and PATRICK J. MURPHY, ESQ of PATRICK MURPHY &

28

ASSOCIATES, and for their cause of action, complain and allege as follows:

1   1.    At all times material to this action, Plaintiff MARY JOLYNN MURPHY, was and is a

2   resident of the State of Nevada and the natural mother of JOSHUA MURPHY, deceased.

3   2.    At all times material to this action, Plaintiff MICHAEL BROWNING, was and is a

4   resident of the State of Nevada and the natural father of JOSHUA MURPHY, deceased.

5   3.    On February 9, 2010, JOLYNN MURPHY was appointed Special Administrator of the

6   Estate of JOSHUA MURPHY for the purpose of this litigation.

7   4.    At all times mentioned herein SEVEN RESORTS, INC., was and is a Domestic

8   Corporation qualified to and doing business in the State of Nevada as SEVEN CROWN

9   RESORTS (hereinafter referred to as 'SEVEN CROWN") and was in the business of renting,

10  leasing, selling, advertising, inspecting and recommending for use to the general public

11  recreational equipment, including the Summit Houseboat identified in Exhibit 1 attached hereto,

12  for use on Lake Mead in Clark County, Nevada.

13  5.    The true names and capacities of the Defendants designated herein as DOE or ROE

14  CORPORATIONS are presently unknown to Plaintiffs at this time who, therefore, sue said

15  Defendants by such fictitious names and when their true names and capacities are ascertained,

16  Plaintiffs will amend this Complaint accordingly to insert the same herein.

17       Plaintiffs are informed and believe, and based upon such information and belief, allege,

18  that Defendants, and each of them, designated as DOES, and/or ROE CORPORATIONS are, in

19  some manner, responsible for the occurrences and injuries sustained by Plaintiffs, as alleged.

20  6.    That at all times mentioned herein, each of the Defendants herein named, were the agents,

21  servants, and employees of each of the remaining Defendants, and at all times mentioned herein

22  each was acting within the time, place and scope of said agency and employment.

23                          FIRST CAUSE OF ACTION
                                (Negligence)
24
25  7.    That on August 17, 2009, Plaintiff MICHAEL BROWNING reserved the use of a

    Summit Houseboat from Seven Crown through the *Houseboating.org website*.
26
27  8.    That on August 20, 2009, Plaintiff MICHAEL BROWNING and his family, including,

    but not limited to JOSHUA MURPHY, minor, deceased, (hereinafter referred to as "JOSHUA")
28

                                        2

1  were using the Summit Houseboat in the manner in which it was intended at Lake Mead in Clark
2  County, Nevada.

3  9.      That on August 20, 2009, JOSHUA was on a raft at or near the swim platform of the
4  beached houseboat.   Plaintiff BROWNING was preparing dinner and JOSHUA was seen by
5  another family member on a raft in close proximity to the swim platform of the beached
6  houseboat when he went to tell JOSHUA that dinner would be ready in a few minutes.

7  10.      Within five minutes BROWNING called to JOSHUA that dinner was ready and when he
8  received no response, discovered JOSHUA MURPHY was gone from the raft. BROWNING
9  then found JOSHUA MURPHY floating face-down in the water at the back of the boat.

10  11.      BROWNING immediately pulled JOSHUA into the boat and initiated CPR on JOSHUA,
11  and the Lake Mead National Park Service was immediately called.

12  12.      When the Lake Mead Park Service arrived they moved JOSHUA to Echo Bay where he
13  was then airlifted to University Medical Center and was pronounced dead.

14  13.      That an autopsy report from the Clark County, Nevada Coroner's office listed the cause
15  of death as carbon monoxide poisoning.

16  14.      That JOSHUA was caused to inhale carbon monoxide gas from the defective exhaust
17  system, causing JOSHUA to sustain permanent and serious injuries, including death.

18  15.      That Defendant SEVEN CROWNS, and each of them, owed a duty to all persons who
19  could reasonably be foreseen to be on or upon said Summit Houseboat to inspect and maintain
20  said houseboat in such a manner as to keep it free and safe from defective or dangerous
21  conditions, including, but not limited to carbon monoxide gas.  Said duty was owed by said
22  Defendants to the Plaintiffs, and in particular to JOSHUA.

23  16.      That Defendant SEVEN CROWNS, and each of them, breached said duty by neglecting
24  to install a Safe-CO generator or to install a standard generator and a vertical stack that exhausts
25  the gases above and away from the inhabitants including those in the water under the swim
26  platform, where deadly, odorless, carbon monoxide fumes can accumulate and overcome
27  swimmers

28  17.      That on August 20, 2009, Plaintiffs relied upon said representations and warranties and

3

1  had no knowledge of the unsafe quality of the Summit Houseboat provided by SEVEN
2  CROWNS.

3  18.     That the Summit Houseboat was not fit for the purpose for which it was intended in that it
4  was so defectively designed, manufactured, tested, produced, delivered, maintained, repaired,
5  assembled, inspected and installed, when used by the Plaintiff in the usual and normal manner, it
6  caused severe and permanent injury, including death, in an amount in excess of Ten Thousand
7  ($10,000.00) Dollars.

8  19.     Plaintiffs have been required to engage the services of an attorney to bring this action and
9  are, therefore, entitled to reasonable attorney's fees and costs.

10                                      SECOND CAUSE OF ACTION

11                                          (Breach of Warranty)

12          Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1
13  through 19 above, as though fully set forth herein.

14  20.     Defendants, and each of them, warranted and represented that the Summit Houseboat
15  referenced in Exhibit 1, was of merchantability quality.

16  21.     The Summit Houseboat referenced in Exhibit 1 was not of merchantable quality in that
17  when used in the normal manner by Plaintiff BROWNING, it caused severe and permanent
18  injuries, including death, to JOSHUA.

19  22.     Defendants, and each of them, owed a duty to all persons, including Plaintiffs and
20  JOSHUA, who could reasonably be foreseen to be on or upon said Summit Houseboat to inspect
21  and maintain said Summit Houseboat in such a manner as to keep it free and safe from defective
22  or dangerous conditions, including, but not limited to carbon monoxide gas.

23  23.     That the Defendants, and each of them breached said duty by allowing a dangerous and
24  defective condition to exist thereon, to wit: exposing JOSHUA, and all other Plaintiffs, to be
25  exposed to carbon monoxide and potentially carbon monoxide poisoning and Defendants, and
26  each of them, knew or should have known that such dangerous conditions existed and was the
27  actual and proximate cause of death to JOSHUA.

28  24.     By reason of the premises and as a direct and proximate result thereof, JOSHUA suffered

                                                    4

1   severe and permanent injuries and was otherwise injured and caused to suffer great pain of body
2   and mind; all of some of which conditions may be permanent and disabling in nature, all to her
3   damage in an amount in excess of Ten Thousand ($10,000.00) Dollars.

4   25.   That by reason of the premises and as a direct and proximate result thereof Plaintiffs and
5   the Estate of Joshua Murphy has incurred expenses for medical care and treatment and funeral
6   expenses incidental thereto, all to their damage, the present amount of which is unascertainable.
7   Plaintiff, Estate of Joshua Murphy, prays leave of the Court to insert all said damages herein
8   when the same have been fully ascertained.

9   26.   That Plaintiffs have been required to engage the services of an attorney to bring this
10   action and are, therefore, entitled to attorney's fees and costs.

11 <div align="center">THIRD CAUSE OF ACTION</div>

12 <div align="center">(Failure to Warn)</div>

13      Plaintiff repeat and reallege each and every allegation contained in Paragraphs 1 through
14   26 of the First and Second Cause of Action as though same were fully set out herein.

15   27.   The negligence of the Defendants, and each of them, in addition to that hereinabove
16   alleged includes, but is not limited to the following as identified by NIOSH, National Institute for
17   Occupational Safety and Health following a January 24-25, 2001 inspection at Lake Mead.

18   28.   Defendants, and each of them, were advised as follows:

19      a.   The open space under the swim platform could be lethal under certain
20         circumstances, i.e., generator/motor exhaust discharging into this area on some
21         houseboats;

22      b.   Some CO concentrations above and around the swim platform were at or above
23         the immediately dangerous to life and health (IDLH) level (greater than 1,200
24         parts of CO per million parts of air [ppm]).

25   . . . . . .

26   29.   That prior to August 20, 2009, Defendants, and each of them, were made aware of the
27   danger invoked by the carbon monoxide vents and refused to take reasonable care to correct the
28   dangerous and hazardous condition and in failing to warn the Plaintiff of its existence and failed

<div align="center">5</div>

1  to warn Plaintiffs of the dangers of using the Summit houseboat due to the faulty carbon
2  monoxide vent system.

3  30.    As a direct and proximate result of Defendant, and each of them, JOSHUA died from
4  carbon monoxide poisoning all to the damage of the Plaintiffs, and each of them, in an amount in
5  excess of Ten Thousand ($10,000.00) Dollars.

6  31.    Plaintiffs have been required to engage the services of an attorney to bring this action and
7  are, therefore, entitled to reasonable attorney's fees and costs.

8                           FOURTH CAUSE OF ACTION

9                              (Misrepresentation)

10     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through
11  31 above, as though fully set forth herein.

12  32.    Defendants, and each of them, were engaged in the distribution, introducing, transporting,
13  delivering, advertising, selling and leasing and recommending for use to the general public the
14  Summit Houseboat with a defective carbon monoxide venting system, with the knowledge that
15  said product was to be used by the general public, including Plaintiffs, and that Defendants, and
16  each of them, represented and warranted said product was fit for the purpose intended.

17  33.    That on or before August 20, 2009, Plaintiffs relied upon said representation and
18  warranties and had no knowledge of the unsafe quality of the Summit Houseboat referenced in
19  Exhibit 1.

20  34.    Said Summit Houseboat was not fit for the purpose for which it was intended in that it
21  was so defectively designed, produced, delivered, maintained, repaired, assembled, inspected and
22  installed, that when used by the Plaintiffs in the usual and normal manner for which it was
23  intended, caused severe injuries, and death, to JOSHUA as hereinbefore stated in an amount in
24  excess of Ten Thousand ($10,000) Dollars.

25  35.    Plaintiffs have been required to engage the services of an attorney to bring this action and
26  are therefore, entitled to reasonable attorney's fees and costs.

27                           FIFTH CAUSE OF ACTION

28                              (Strict Liability)

6

1  Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through
2  35 above, as though same were fully set forth herein.

3  36.  Defendants, and each of them, introduced into the stream of commerce in the United
4  States of America, at Clark County, Nevada, that certain Summit Houseboat referenced in
5  Exhibit 1 attached hereto, while it was in a dangerous and defective condition.

6  37.  Defendants, and each of them, are strictly liable to Plaintiffs because of the dangerous and
7  defective nature of the Summit Houseboat referenced in Exhibit 1 attached hereto.

8  38.  Defendants, and each of them, were aware of the dangerous and defective condition when
9  introduced into the stream of commerce by Defendants, and each of them, in particular in Clark
10  County, Nevada, and failed to ensure that the carbon monoxide system was properly vented,
11  and/or the Plaintiffs were warned of the dangerous and defective condition, particularly when
12  used for the purpose for which it was intended and that it would cause serious injury or death to
13  the users thereof, including Plaintiffs.

14  39.  That the above facts were known to Defendants and each of them, or in the exercise of
15  due care, should have been known to the Defendants and each of them, and in the condition,
16  Defendants possessed special knowledge of the materials, design, character and assemblage of
17  said Product, Plaintiffs, at no time, had any special knowledge and at not time were they aware,
18  or made aware of the danger and defective condition of the Summit houseboat.

19  40.  Although possessed of the special knowledge of the dangerous and defective condition,
20  Defendants, and each of them, negligently and carelessly failed to warn the Plaintiffs of said
21  condition.

22  41.  Plaintiffs have been required to engage the services of an attorney to bring this action and
23  are therefore entitled to reasonable attorney's fees and costs.

24  42.  As a direct and proximate result of the dangerous and defective condition of said product,
25  Plaintiff JOSHUA and all other Plaintiffs, including the Estate of Joshua Murphy was caused to
26  suffer severe and permanent injuries, including death, all to their damage in an amount in excess
27  of Ten Thousand ($10,000) Dollars.

28  43.  Plaintiffs have been required to engage the services of an attorney to bring this action and

7

1  are, therefore, entitled to reasonable attorney's fees and costs.

2  SIXTH CAUSE OF ACTION

3  (Punitive Damages)

4  Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through

5  43 above, as though fully set forth herein.

6  44.  Defendants, and each of them, by said actions, acted with willful misconduct and with

7  conscious and/or reckless disregard of the safety of the Plaintiffs and others. Due to said

8  misconduct, Plaintiff seeks punitive and exemplary damages to be assessed against the

9  Defendant, and each of them.

10  45.  Plaintiffs have been required to engage the services of an attorney to bring this action and

11  are, therefore, entitled to reasonable attorney's fees and costs.

12  Wherefore, Plaintiffs pray for judgment against the Defendants, and each of them, as

13  follows:

14  FIRST CAUSE OF ACTION:

15  1.  For damages in an amount in excess of Ten Thousand ($10,000) Dollars.

16  2.  For reasonable attorney's fees and costs;

17  3.  For such other and further relief as the Court deems just and proper.

18  SECOND CAUSE OF ACTION:

19  1.  For damages in an amount in excess of Ten Thousand ($10,000) Dollars.

20  2.  For reasonable attorney's fees and costs;

21  3.  For such other and further relief as the Court deems just and proper.

22  THIRD CAUSE OF ACTION:

23  1.  For damages in an amount in excess of Ten Thousand ($10,000) Dollars.

24  2.  For reasonable attorney's fees and costs;

25  3.  For such other and further relief as the Court deems just and proper.

26  FOURTH CAUSE OF ACTION:

27  1.  For damages in an amount in excess of Ten Thousand ($10,000) Dollars.

28  2.  For reasonable attorney's fees and costs;

8

1  3.    For such other and further relief as the Court deems just and proper.

2  FIFTH CAUSE OF ACTION:

3  1.    For damages in an amount in excess of Ten Thousand ($10,000) Dollars.

4  2.    For reasonable attorney's fees and costs;

5  3.    For such other and further relief as the Court deems just and proper.

6  SIXTH CAUSE OF ACTION:

7  1.    For punitive and exemplary damages in an amount in excess of Ten Thousand ($10,000)

8        Dollars;

9  2.    For damages in an amount in excess of Ten Thousand ($10,000) Dollars.

10  3.    For reasonable attorney's fees and costs;

11  4.    For such other and further relief as the Court deems just and proper.

12        Dated this 7 day of March, 2010.

13                                    SAM HARDING LAW FIRM

14

15                                    _____
                                     SAM HARDING, ESQ., #1877
16                                   1100 E. Bridger Avenue
                                     Las Vegas, NV 89101
17                                   Attorney for MARY JOLYNN MURPHY
                                     MARY JOLYNN MURPHY as Special
18                                   Administrator ESTATE OF JOSHUA MURPHY

19

20                                    _____
                                     PATRICK J. MURPHY, ESQ. #1222
21                                   1100 East Bridger Avenue
                                     Las Vegas, NV 89101
22                                   702-259-4600
                                     Attorney for MICHAEL BROWNING
23

24

25

26

27

28

                                          9